# EXHIBIT A

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF O



OAKLAND COUNTY 10-107020-CK

JUDGE D LANGFORD MORRIS
P&M CORPORATE V PAPARELLA MI

P&M CORPORATE FINANCE, LLC,

        Plaintiff,

                            Case No. 10-   -CK

v.

                            Hon.

MICHAEL PAPARELLA,

        Defendant.

---

**McDONALD HOPKINS PLC**
By: **James J. Giszczak (P46917)**
     **Dominic A. Paluzzi (P71666)**
39533 Woodward Ave., Ste. 318
Bloomfield Hills, MI 48304
248-220-1354
*jgiszczak@mcdonaldhopkins.com*
*dpaluzzi@mcdonaldhopkins.com*
**Attorneys for Plaintiff**

---

## VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, P&M Corporate Finance, LLC ("PMCF"), by its attorneys, McDonald

Hopkins PLC, states as follows:

### INTRODUCTION

1.     This action arises out of various torts, breaches of contracts and violations of

MCL § 600.2919(A), et. seq.

## JURISDICTION AND PARTIES

2.     PMCF is a Michigan limited liability company with its principal place of business at 26300 Northwestern Hwy., Ste. 120, Southfield, Michigan 48076.

3.     Upon information and belief, Defendant Michael Paparella ("Paparella") resides at 3643 North Shore Drive, Akron, Ohio 44333.

4.     The events giving rise to this litigation occurred in Oakland County Michigan.

5.     The amount in controversy exceeds $25,000, exclusive of interest, costs and attorney fees, and PMCF seeks injunctive relief as well.

## GENERAL ALLEGATIONS

6.     PMCF is an investment banking advisory firm that provides services on a global basis.

7.     PMCF hired Paparella on or about June 21, 2004.  At that time, Paparella was hired as a Director of PMCF.  During his employment with PMCF, PMCF trained Paparella in its confidential and proprietary processes and procedures involved in providing investment banking advisory services, and provided him exposure to the following industries: skilled nursing care; rehabilitation and physical therapy facilities, assisted living; pharmacy management companies, pharmacies, physician practices and physician practice management firms; nursing homes; long term care facilities; business services; data management and storage; business process outsourcing; facilities management; collection agencies and firms; title; real estate liquidation and disposition; casting; forging; stamping; precision machining; extrusion; metal fabrication including the production of tanks, cylinders and vessels; steel production including bar; distribution of industrial components and materials; general contracting; road building and construction; concrete production; concrete distribution;

{2007192:}

2

production and fabrication of concrete components, HVAC contracting; electrical contracting; medical device production; medical device design, diagnostic testing, plastics companies including injection molding, blow molding, extrusion, distribution, and sheet production, producers of capital equipment and goods, retailers, developers and distributors of software. In his capacity as Director at PMCF, Paparella was responsible for, among other things, building, maintaining and developing relationships with PMCF's clients and prospective clients, as well as developing, updating and implementing PMCF's confidential and proprietary processes and procedures. Paparella was also charged with developing and maintaining relationships with prospective acquirers, financing sources, capital sources, referral sources, attorneys, bankers, equity funds, and subordinated debt providers, all on behalf of PMCF.

8.     At the time he began his employment with PMCF, and in consideration for that employment, Paparella executed a P&M Corporate Finance Staff-Relationship Agreement ("Relationship Agreement") with PMCF. A true and accurate copy of Paparella's Relationship Agreement is attached to this Complaint as **Exhibit A** and is incorporated herein by reference.

9.     Pursuant to the Relationship Agreement, Paparella agreed, in part, as follows:

1.     Confidentiality. During the term of the staff member's employment by PMCF and at all times thereafter, the staff member agrees to not directly or indirectly disclose to anyone, or use or otherwise exploit for the benefit of anyone other than PMCF of the Firm, PMCF's or the Firm's trade secrets, client lists, supplier lists, marketing arrangements, business plans, projections, software, patents, inventions, financial information, personnel manuals, training manuals, pricing manuals, product and service development plans, market strategies, checklists, templates, spreadsheets, financial models, databases, internal performance statistics and other competitive sensitive information concerning PMCF or the Firm, whether or not in written, tangible or any other form. The staff member also agrees to not directly or indirectly disclose to anyone, or use or otherwise exploit for the benefit of anyone other

{2007192:}

3

than PMCF or the Firm any information obtained from, or related to a client. These restrictions do not apply to such information which is known to the public so long as such knowledge does not result from a breach of any provision of this Agreement by the staff member or from a breach by any other person who owes a duty of non-disclosure or non-use to PMCF or the Firm.

2.     Protected Information. Any programs, inventions, patents, software, ideas, methods, plans, improvements, products or other confidential information that are developed at PMCF or the Firm prior to and/or during the staff member's employment are rightfully the property of PMCF or the Firm. Upon severance of employment for any reason, any such Protected Information and any record the staff member may have of such Protected Information will be delivered over to your supervisor. The staff member makes no claim whatsoever to the ownership of such Protected Information and will not during the staff member's employment with PMCF or the Firm or at any time thereafter use the Protected Information except in connection with PMCF's or the Firm's business.

All workpapers, records, programs, designs, patents, business plans, financial statements, manuals, checklists, templates, spreadsheets, financial models, databases, memoranda, lists and other property created by, delivered to or compiled by the staff member by or on behalf of PMCF or the Firm or its representatives, vendors or customers which pertain to the business of PMCF or the Firm shall be and remain the property of PMCF or the Firm and be subject at all times to its discretion and control. Likewise, all correspondence, reports, records, charts, advertising materials and other similar data pertaining to PMCF's or the Firm's business, activities or future plans which are collected by the staff member shall be delivered promptly to the staff member's supervisor without request upon termination of the staff member's employment and thereafter.

Database information otherwise covered by this Section 2 is not Protected Information if (a) it is known to the public (so long as such knowledge does not result from a breach of any provision of this Agreement by the former staff member or from a breach by any other person who owes a duty of non-disclosure or non-use to PMCF or the Firm) and except for names and contact information was not generated by PMCF or its staff or; (b) if the PMCF Board (or its designees) waives such designation.

\*   \*   \*

5.     Client Solicitation. During the staff member's employment and during the two year period thereafter the staff member shall not, directly or indirectly, render investment banking services, including merger and acquisition advisory, valuation advisory, financing and capital sourcings, strategic advisory, or

targeted acquisition search, other than as a bona fide, full-time employee of a client, to any PMCF Client.

If there is a breach of this Section 5, then in addition to any other relief available to PMCF and the Firm, the former staff member shall pay to PMCF an amount equal to 75% of the aggregate fees attributable to (a) PMCF services prior to the termination of the staff member's services with PMCF and (b) services by the former staff member and his or her employer/affiliate during the two years following such termination. In determining the fees to be paid to PMCF, consideration will be given to the scope of the total engagement (including discreet segments commenced after termination of the former staff member's employment), the time incurred on the engagement during such two year period in relationship to the total time incurred on the engagement (both before and after such termination of employment), amounts billed on the engagement and amounts collected (both before and after such termination) from clients. Payment of this amount will be due to PMCF as soon as the PMCF share is reasonably determinable. The staff member agrees to cooperate with PMCF in determining this amount.

\* \* \*

For purposes of this Agreement, a "PMCF Client" is any person or entity (including their successors, assigns and predecessors) for which during the 24 months preceding such termination: PMCF provided services towards or for a fee; PMCF had meaningful discussions intended to lead to an engagement contract for services; or the Firm provided services toward or for a fee (whether or not related to PMCF services) and the staff member gained access to otherwise confidential information regarding such person or entity through employment with PMCF.

6.      Governing Law, Amendment, Waiver and Severability.  The laws of the State of Michigan govern this Agreement.  In the event that the staff member violates the terms of any part of this Agreement, PMCF, in addition to the other remedies available to it under law including monetary damages, shall have the right to apply to any court of competent jurisdiction for an injunction restraining the staff member from further violation.  No amendment to this Agreement, nor any waiver of any right under this agreement, will be effective unless it is in writing and signed by the PMCF officer designated by the board of PMCF.  If one or more of the provisions in this Agreement shall be determined to be illegal, invalid, or unenforceable, such provision shall be modified to the extent necessary to be legal, valid and enforceable or, if not capable of being modified, shall be severable while the remaining provisions will continue in full force and effect.

{2007192:}

5

10.     On or about July 1, 2007, Paparella was promoted to Managing Director ("MD"), and became a Member and owner of PMCF.

11.     At that time, Paparella agreed to the terms of the PMCF MD Member Agreement ("Member Agreement"), attached hereto as **Exhibit B**, which included, but was not limited to, similar confidentiality and client solicitation restrictions and the following terms, in addition to the terms of the existing Relationship Agreement:

   a.     Paparella agreed to a 5% prorated profit and loss partnership interest;

   b.     Paparella agreed to an annual managing director income allocation as determined by the Board of Directors prorated based on actual months of service for any member who was not an active member for the full fiscal year; and

   c.     Paparella agreed to contribute a required HR-10 Pension Contribution each fiscal year.

12.     During the course of his employment with PMCF, Paparella had access to and utilized on a regular basis PMCF's most confidential and proprietary information, including, but not limited to, financial models, industry research, industry reports and related data, proposals, information concerning the industries referenced in Paragraph 7 above, information regarding particular projects, presentations, growth plan summaries, engagement documents, selling memoranda, offering memoranda, buyers list and private equity hot lists, confidentiality agreements, management presentations, service agreements, client lists, prospect lists, operational procedures, PMCF's business affairs, marketing and sales strategies and practices, and pricing and contractual details for clients.

13.     Paparella acquired intimate knowledge concerning PMCF's clients' and prospective clients' needs, preferences and service needs. He had extensive contact with

{2007192:}

6

PMCF's clients and prospects. The information that Paparella was exposed to and utilized on a daily basis is housed on PMCF's computer servers, which are located in Michigan.

14. PMCF provided Paparella with extensive training and knowledge of PMCF's business processes, strategic planning and marketing strategies. In addition, Paparella traveled to Michigan to attend meetings during which he gained knowledge of and training as to PMCF's confidential business information.

15. On or about April 1, 2009, Paparella withdrew as a Member of PMCF and returned to the status of staff member with PMCF as Entity Principal and Managing Director.

16. Paparella submitted his voluntary resignation from PMCF on September 3, 2009, and Paparella's employment with PMCF terminated effective September 8, 2009.

17. Paparella returned his computer to PMCF on September 11, 2009, eights days after his resignation.

18. The information to which Paparella was exposed is of great value not only to PMCF, but also to its competitors who do not possess, or have access to, this information. For this reason, PMCF takes reasonable steps to insure that its information stays confidential. Such measures include the use of anti-piracy, non-solicitation and confidentiality agreements, password protection and access to information on a need-to-know basis, and other security measures.

19. Recently, PMCF discovered that Paparella is working as a Managing Director for Candlewood Partners, LLC ("Candlewood") in its Cleveland, Ohio office, and appears to be utilizing PMCF's confidential and proprietary information that he misappropriated. Candlewood is a direct competitor providing the same or similar services as those provided by

{2007192:}

7

PMCF. Although Candlewood is a direct competitor of PMCF, Candlewood would not have access to PMCF's confidential and proprietary documents and information.

20. In the course of investigating Paparella's computer activities, it was discovered that Paparella misappropriated PMCF confidential, proprietary and trade secret documents, relative to clients, prospects and projects that Paparella was intimately engaged in while employed with PMCF.

21. Moreover, upon information and belief, Paparella misappropriated hardcopy files of recent proposals, hot prospects and projects that Paparella was actively engaged in.

22. Upon information and belief, Paparella has solicited and is providing services to PMCF's prospects and/or clients, including, but not limited to American Ring, Collinwood Concrete, and Wrayco Industries, on behalf of Candlewood.

23. While employed by PMCF, Paparella also provided competitors proposed business plans, identifying the PMCF clients and deals he would improperly bring if hired by those competitors.

24. In addition, prior to returning his PMCF computer to PMCF, Paparella deliberately attempted to wipe his hard drive in an effort to conceal his improper conduct.

25. The confidential and proprietary and trade secret information to which Paparella had access and misappropriated will directly aid his employment with a direct competitor.

26. As a direct result of Paparella's actions, PMCF is faced with the substantial risk that Paparella will continue to unlawfully use its confidential, proprietary and trade secret information, as well as that of its clients, to PMCF's competitive disadvantage. As the result of Paparella's actions, PMCF has suffered and will continue to suffer irreparable harm. In his

{2007192}

8

new employment, Paparella will necessarily be called upon to use the trade secrets and confidential information that he misappropriated, as he has already demonstrated via his solicitation of clients and/or prospective clients. Such use and disclosure is inevitable, and has already occurred.

27.     PMCF lacks an adequate remedy at law to address the substantial and irreparable harm that it is suffering as a result of Paparella's actions.

28.     Paparella had a fiduciary relationship with PMCF.

29.     Paparella assumed a relationship of trust and confidence with PMCF.

30.     Those relationships were one of principal (PMCF) and agent (Paparella) as well as employer and owner/employee in which Paparella was obligated to act only in the interest of PMCF.

31.     Despite his obligations, Paparella has misappropriated PMCF's trade secrets and confidential information.

32.     With PMCF's confidential and proprietary information, Paparella is now providing the identical services he provided while employed by PMCF; improperly utilizing PMCF's secret, confidential and proprietary processes, programs and information, which he misappropriated, all in violation of his obligations to PMCF. Accordingly, a preliminary and permanent injunction restraining and enjoining Paparella from continuing these actions is the only remedy that will afford PMCF meaningful relief.

33.     PMCF has been and will continue to be severely damaged by Paparella's actions in violation of his confidentiality obligations as set forth in this Verified Complaint.

34.     PMCF has no adequate remedy at law for Paparella's actions relative to the misappropriation of PMCF trade secrets, since the damages PMCF has suffered and will

{2007192:}

9

continue to suffer, in connection with the divulgence of confidential information and trade secrets are incapable of exact proof and have caused PMCF irreparable harm.

35. Paparella will, unless restrained preliminarily and permanently, continue to violate PMCF's rights, and Paparella will continue to ignore his duties to PMCF by continuing his misuse of the information he misappropriated.

36. Due to the divulgence of confidential and proprietary information and trade secrets, as well as the loss of its competitive edge, client goodwill and fair competition, PMCF has been injured in an amount that exceeds \$25,000, exclusive of interest, costs, and attorneys' fees.

37. On December 9, 2009, PMCF provided Paparella a break-down of the amounts he owed PMCF as agreed upon as a member of PMCF. Paparella has not paid the amounts owed.

## COUNT I

### BREACH OF CONTRACT – RELATIONSHIP AGREEMENT AND MEMBER AGREEMENT CONFIDENTIALITY PROVISION

38. PMCF realleges each and every allegation contained in paragraphs 1 through 37 inclusive, of this Verified Complaint as though completely set forth herein.

39. The Relationship Agreement and Member Agreement are valid and binding contracts under Michigan law.

40. The Relationship Agreement and Member Agreement executed and/or agreed to by Paparella were supported by adequate consideration.

41. Paparella's misappropriation, use and failure to return PMCF's confidential, proprietary and trade secret information and property constitute a breach of the

{2007192:}

10

Confidentiality provision contained in Paragraph 1 of the Relationship Agreement, attached as **Exhibit A**, and a breach of Paragraph 6.1 of the Member Agreement, attached as **Exhibit B**.

42.     As a result of Paparella's conduct, PMCF has suffered irreparable injury, and there is imminent danger that PMCF will continue to suffer irreparable injury from which there is no adequate remedy at law.

43.     PMCF is entitled to preliminary and permanent injunctive relief against further breaches of these agreements.

44.     PMCF has also suffered monetary damages as a direct result of these breaches, in an amount that exceeds $25,000, exclusive of interest, costs, and attorneys' fees.

**COUNT II**

**BREACH OF CONTRACT – RELATIONSHIP AGREEMENT AND MEMBER AGREEMENT**
**CLIENT SOLICITATION PROVISION AND NON-COMPETITION PROVISION**

45.     PMCF realleges each and every allegation contained in paragraphs 1 through 44 inclusive, of this Verified Complaint as though completely set forth herein.

46.     The Relationship Agreement and Member Agreement are valid and binding contracts under Michigan law.

47.     The Relationship Agreement and Member Agreement executed and/or agreed to by Paparella were supported by adequate consideration.

48.     Upon information and belief, Paparella has solicited, and/or is providing services to, PMCF's prospects and/or clients, including, but not limited to, American Ring, Collinwood Concrete, and Wrayco Industries, on behalf of Candlewood.

{2007192:}

11

49. Paparella's solicitation of PMCF's clients constitutes a breach of the Client Solicitation provision contained in Paragraph 5 of the Relationship Agreement, attached as **Exhibit A**, and a breach of Paragraph 5.1 of the Member Agreement, attached as **Exhibit B**.

50. As a result of Paparella's solicitation, PMCF is entitled to 75% of the aggregate fees attributable to (a) PMCF services prior to the termination of Paparella and (b) services by Paparella and Candlewood during the two years following such termination, relative to each PMCF Client solicited *(See ¶ 5, **Exhibit A**)* or, in the alternative, 75% of the aggregate fees attributable to the higher of: (i) Company services prior to the sale of Paparella's Units; and (ii) such services during the two (2) year period following such sale of Units by Paparella or any Person in which he has a direct or indirect interest [as an employee, independent contractor, shareholder, creditor (except for fees for services rendered), partner, manager, member or beneficiary] *(See ¶ 5.4, **Exhibit B**.)*

## COUNT III

### BREACH OF FIDUCIARY DUTY

51. PMCF realleges each and every allegation contained in paragraphs 1 through 50, inclusive, of this Verified Complaint as though completely set forth herein.

52. Paparella has a fiduciary duty to PMCF.

53. Paparella assumed a position of trust and confidence in his duties at PMCF.

54. Defendant Paparella, while an employee and owner of PMCF, owed to PMCF a fiduciary duty of loyalty, to work in the best interests of PMCF, and not to engage in competitive activities harmful to PMCF.

55. As set forth above, Defendant Paparella breached his fiduciary obligations.

{2007192:}

12

56. Paparella was placed in a position of trust and confidence with regard to PMCF's confidential business information and properties in his possession. Paparella had a fiduciary obligation not to misappropriate, use or disclose this confidential business information and property.

57. As an agent of PMCF, Paparella had a duty to PMCF not to use or to disclose to third persons, on his own account or on account of others, in competition with PMCF, trade secrets, or other similar confidential matters given to him only for PMCF's use.

58. At all times, the confidential business information and property held by Paparella rightfully belonged to PMCF.

59. Paparella has breached his duty not to misappropriate, disclose or use the confidential information and trade secrets of PMCF in competition with PMCF.

60. Candlewood is a direct competitor of PMCF.

61. Paparella has breached his obligations of confidentiality and non-disclosure.

62. Paparella breached all of the aforementioned obligations. PMCF has been severely damaged by Paparella's breach of his fiduciary duty, trust, and confidence obligations.

63. PMCF's damages have been proximately caused by Paparella's breaches of his fiduciary duty to PMCF.

64. As a proximate result of Defendant Paparella's violations of his fiduciary duty, PMCF has been and will continue to be irreparably damaged and injured.

65. PMCF has no adequate remedy at law for Defendant Paparella's actions since the damages PMCF has suffered and will continue to suffer in connection with Paparella's

{2007192:}

violations of fiduciary duty and divulgence of confidential information and trade secrets are incapable of exact proof.

66. Defendant Paparella will, unless restrained preliminarily and permanently, continue to violate PMCF's rights and Paparella will continue to ignore his fiduciary duty to PMCF by continuing to misuse and disclose PMCF's confidential information.

67. Accordingly, a preliminary and permanent injunction restraining and enjoining Defendant Paparella from continuing these actions is the only remedy that will afford PMCF meaningful relief.

68. Due to Paparella's use and disclosure of PMCF's proprietary information and trade secrets and the divulgence of confidential information and trade secrets, PMCF has also been injured in an amount that exceeds $25,000.00, exclusive of interest, costs and attorneys' fees.

## COUNT IV

### PROMISSORY ESTOPPEL/UNJUST ENRICHMENT – PMCF TRADE SECRETS

69. PMCF realleges each and every allegation contained in paragraphs 1 through 68 inclusive, of this Verified Complaint as though completely set forth herein.

70. As a result of Paparella's misappropriation of PMCF's trade secrets and other proprietary information, Paparella is in receipt of proprietary and confidential information and trade secrets of PMCF.

71. The proprietary information, confidential information and trade secrets are of immense value to any person and entities operating in a business similar to PMCF.

72. The proprietary information that Paparella has used and undoubtedly will continue to use in the future was created by PMCF over many years at great costs.

{2007192:}

14

73. Paparella already has used to his benefit, and to the benefit of Candlewood, PMCF's confidential and proprietary information.

74. Paparella's disclosure and possession of PMCF's property has provided him with valuable materials.

75. Paparella's disclosure and possession of PMCF's property has resulted in an inequity. Paparella is benefiting unjustly from the time, money and effort spent by PMCF over a number of years to create this information and develop the relationships with its clients and develop new business with prospective clients. Paparella's possession and disclosure has allowed him to step into the shoes of PMCF, without having to spend the time, money and effort performed by PMCF to develop the property, relationships and prospects at issue.

76. PMCF has no adequate remedy at law for Paparella's damages since the damages PMCF has suffered and will continue to suffer in connection with the use of its property and conversion of its client relationships and carefully developed prospects, as well as the loss of its client good will, are incapable of exact proof.

77. Accordingly, a preliminary and permanent injunction, restraining and enjoining defendant from continuing this action is the only remedy that will afford PMCF meaningful relief.

## COUNT V

### PROMISSORY ESTOPPEL/UNJUST ENRICHMENT – PMCF MEMBER BENEFITS

78. PMCF realleges each and every allegation contained in paragraphs 1 through 77 inclusive, of this Verified Complaint as though completely set forth herein.

79. As a result of Paparella's relationship with PMCF as an MD, Paparella received certain Member benefits, including, but not limited to, a 5% partnership interest in

{2007192:}

15

PMCF and a draw of up to $250,000.00 against an annual managing director income allocation.

80.    Moreover, Paparella's prorated managing director income allocation for fiscal year 2009 was $112,500.00. Paparella, however, took draws against this income totaling $146,969.50 leaving a balance deficit and a balance due to PMCF of $34,469.50.

81.    Paparella has received substantial benefits as a result of his relationship with PMCF and continues to benefit despite terminating his relationship with PMCF in September 2009.

82.    Paparella has failed and refused to pay PMCF for the benefits received from PMCF in accordance with the Membership Agreement.

83.    In the event Paparella fails to pay PMCF, Paparella will be unjustly enriched in an amount that exceeds $25,000, exclusive of interest, costs and attorneys' fees.

## COUNT VI

## CONVERSION

84.    PMCF realleges each and every allegation contained in paragraphs 1 through 83 inclusive, of this Verified Complaint as though completely set forth herein.

85.    As set forth above, Paparella misappropriated and has failed to return PMCF's confidential, proprietary and trade secret information and property. Upon information and belief, Paparella remains in possession of this confidential, proprietary and trade secret information and property.

86.    Moreover, Paparella has failed to refund draws taken in excess of his earned allocation from PMCF.

{2007192:}

16

87. Paparella has intentionally failed to return PMCF's confidential, proprietary and trade secret information and property and has failed to refund the draws taken in excess of his earned allocation.

88. Paparella's possession of PMCF's confidential, proprietary and trade secret property and advanced compensation is inconsistent with PMCF's right to possession.

89. According to MCL 600.2919(A), PMCF may recover three times the amount of actual damages sustained, plus costs and reasonable attorney fees from Paparella.

90. Due to Paparella's failure to return this information, property, and compensation, PMCF has sustained and will continue to sustain damages in excess of $25,000.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff PMCF respectfully requests:

A. That this Court issue a Temporary Restraining Order and a Preliminary and Permanent Injunction restraining and enjoining Defendant Paparella:

    (i) From directly or indirectly soliciting or performing work to or for clients or prospects of PMCF for a period of twenty-four (24) months from the date of this Court's Order;

    (ii) From using or disclosing at any time in the future PMCF's confidential business information, trade secrets, proprietary information or property;

    (iii) From interfering, in any way, with any current contract, client relationship or prospective client relationship of PMCF; and

    (iv) From breaching any fiduciary obligation to PMCF, including but not limited to, appropriating any business opportunity of PMCF, and engaging in deceptive acts or statements with regard to PMCF's abilities, experiences, and personnel.

B. That Paparella be ordered in the form of a mandatory temporary restraining order and preliminary injunction to return all PMCF property to PMCF, including, but not limited to, all originals and copies of requests for proposal, industry reports, industry research, requests for bid, client correspondence, meeting minutes, notes of site visits, marketing data, prospect meeting data,

{2007192:}

17

proposals, faxes, pricing contracts, contracts awarded, marketing brochure, recommendations including but not limited to vendor recommendations, marketing database, marketing plans, costs, client lists, prospect lists, client contact lists, competitive bid information, strategic planning, alliance relationships, prospective employee lists, client information, internal weaknesses, client lists, marketing plans, employee lists, business plans, project costs, confidential client information and confidential customer information;

C.    That Paparella preserve all evidence, including hard copies, electronic, computer or any other format, which in any way relates to the claims made in this case;

D.    That after trial in this action, a permanent injunction be issued to the same effect as the Preliminary Injunction requested above;

E.    That Paparella be ordered to pay PMCF the following:

    (i)    $111,623.21 in Member (owner) loss allocated to Paparella;

    (ii)    $34,469.50 in draws that exceeded his managing director income allocation; and

    (iii)    $18,400.00 in HR-10 Pension Contribution.

F.    That PMCF be granted as relief additional money damages, including those set forth in the Relationship Agreement and exemplary damages, lost profits, all other appropriate damages, as well as all interest, costs, and disbursements of this action, including reasonable attorneys' fees under MCL § 600.2919(A), and such other relief as this Court may deem just and proper.

Respectfully submitted,

**McDONALD HOPKINS PLC**

By:  

James J. Giszczak (P46917)
**Dominic A. Paluzzi (P71666)**
39533 Woodward Ave., Suite 318
Bloomfield Hills, MI 48304
(248) 220-1354
Dated: January 15, 2010           **Attorneys for Plaintiff**

{2007192:}

18

## VERIFICATION

I, Philip C. Gilbert, being first duly sworn, state that I am the Managing Director and President of P & M Corporate Finance, LLC, Plaintiff in the above-entitled action; that I have read the foregoing Verified Complaint and know its content, that to the best of my knowledge, information and belief, the contents thereof are true and accurate.

P&M CORPORATE FINANCE, LLC

By: _____

Its: President

Subscribed and sworn to before me
this 13th day of _____, 20 10 .

_____
Notary Public

{1983967:1}

SUSAN E. HAMILTON
Notary Public, State of Michigan
County of Oakland
My Commission Expires Jun. 18, 2011
Acting in the County of Oakland

# EXHIBIT A

## P&M CORPORATE FINANCE
## STAFF – RELATIONSHIP AGREEMENT

The core purpose of P&M Corporate Finance LLC, ("PMCF") is "To be a caring, professional firm deeply committed to our clients' success." For purposes of this Agreement, PMCF, P&M Holding Group, LLP and all related entities, current and future, are the "Firm". Our two greatest assets are our clients and our staff. We are committed to hiring the best staff members to serve our clients and to providing our staff members with the appropriate training and resources to accomplish our core purpose. We invest substantial training time and dollars in our staff and commit resources to developing the client/staff relationship which is so vital to the fulfillment of our core purpose. If a staff member leaves PMCF, PMCF needs to protect this investment, as well as its intellectual capital. As such, we have agreed to require the execution of this Relationship Agreement.

PMCF agrees to employ Mike Paparella as a staff member and Mike Paparella accepts such employment on en at-will basis. Therefore, employment may be terminated by either party to this Agreement at any time for any reason, with or without notice, with or without cause.

The staff member shall devote time, energy, and efforts to the practice of PMCF and shall do such work as may be required by PMCF subject to the instruction and policies of PMCF as they now stand or may from time to time be determined by PMCF, and represents to PMCF that there are no undisclosed legal restrictions from any prior employment, whether imposed by contract or law, that would limit the ability to do so.

As compensation for the staff member's services, PMCF shall pay the staff member the agreed to semi-monthly base salary on the fifteenth and on the last day of the month. Benefits will also be provided as outlined in the Personnel Manual as amended from time to time including the addition or termination of one or more benefits.

Because client relationships are valuable and unique assets to PMCF, and because these relationships are developed and nurtured through PMCF support, resources, expertise and training, the staff member agrees:

1. **Confidentiality.** During the term of the staff member's employment by PMCF and at all times thereafter, the staff member agrees to not directly or indirectly disclose to anyone, or use or otherwise exploit for the benefit of anyone other than PMCF or the Firm, PMCF's or the Firm's trade secrets, client lists, supplier lists, marketing arrangements, business plans, projections, software, patents, inventions, financial information, personnel manuals, training manuals, pricing manuals, product and service development plans, market strategies, checklists, templates, spreadsheets, financial models, databases, internal performance statistics and other competitive sensitive information concerning PMCF or the Firm, whether or not in written, tangible or any other form. The staff member also agrees to not directly or indirectly disclose to anyone, or use or otherwise exploit for the benefit of anyone other than PMCF or the Firm any information obtained from, or related to a client. These restrictions do not apply to such information which is known to the public so long as such knowledge does not result from a breach of any provision of this Agreement by the staff member or from a breach by any other person who owes a duty of non-disclosure or non-use to PMCF or the Firm.

2. **Protected Information.** Any programs, inventions, patents, software, ideas, methods, plans, improvements, products or other confidential information that are developed at PMCF or the Firm prior to and/or during the staff member's employment are rightfully the property of PMCF or the Firm. Upon severance of employment for any reason, any such Protected Information and any record the staff member may have of such Protected Information will be delivered over to your supervisor. The staff member makes no claim whatsoever to the ownership of such Protected Information and will not during the staff member's employment with PMCF or the Firm or at any time thereafter use the Protected Information except in connection with PMCF's or the Firm's business.

All workpapers, records, programs, designs, patents, business plans, financial statements, manuals, checklists, templates , spreadsheets, financial models, databases, memoranda, lists and other property created by, delivered to or compiled by the staff member by or on behalf of PMCF or the Firm or its representatives, vendors or customers which pertain to the business of PMCF or the Firm shall be and remain the property of PMCF or the Firm and be subject at all times to its discretion and control. Likewise, all correspondence, reports, records, charts, advertising materials and other similar data pertaining to PMCF's or the Firm's business, activities or future plans which are collected by the staff member shall be delivered promptly to the staff member's supervisor without request upon termination of the staff member's employment and thereafter.

Database information otherwise covered by this Section 2 is not Protected Information if (a) it is known to the public (so long as such knowledge does not result from a breach of any provision of this Agreement by the former staff member or from a breach by any other person who owes a duty of non-disclosure or non-use to PMCF or the Firm) and except for names and contact information was not generated by PMCF or its staff or; (b) if the PMCF Board (or its designees) waives such designation.

3. **Business Information.** If during the period of employment with PMCF or the Firm the staff member develops any programs, inventions, patents, software, checklists, templates, spreadsheets, financial models, databases, ideas, methods, plans, improvements, products or other confidential information that does or might relate to PMCF's business, including potential new lines of business, the staff member shall disclose such Business Information to PMCF in writing and PMCF shall have the right, without the payment of any further consideration to the staff member, to adopt such Business Information for its own use. Such business information belongs solely to PMCF whether used by PMCF or not.

10/04/02

**4.  Solicitation of Staff Members.**  During the staff member's employment with PMCF and during the twenty four months thereafter, neither the staff member nor any of the staff member's employers, associates or affiliates will solicit any staff member of PMCF or the Firm for the purpose of inducing such staff member to terminate the staff member's employment with PMCF or the Firm or hire or otherwise associate in business with any such staff member without prior written consent from PMCF and the Firm's Human Resource Director.  This restriction includes solicitation of staff members while working as an external recruiter for a professional search firm.  If there is a breach of this provision, the staff member shall pay to PMCF, as liquidated damages, 100 percent of a solicited staff member's total annualized compensation (current base salary plus most recent bonus paid) at the time of the staff member's termination from PMCF.  Payment will be due within 30 days after the solicited staff member's termination date.

No breach will be deemed to have occurred if the staff member has no direct or indirect involvement with the recruitment of the individual.  The determination of this involvement will be at the sole discretion of PMCF and the Human Resource Director of the Firm.

**5.  Client Solicitation.**  During the staff member's employment and during the two year period thereafter the staff member shall not, directly or indirectly, render investment banking services, including merger and acquisition advisory, valuation advisory, financing and capital sourcing, strategic advisory, or targeted acquisition search, other than as a bona fide, full-time employee of a client, to any PMCF Client.

If there is a breach of this Section 5, then in addition to any other relief available to PMCF and the Firm, the former staff member shall pay to PMCF an amount equal to 75% of the aggregate fees attributable to (a) PMCF services prior to the termination of the staff member's services with PMCF and (b) services by the former staff member and his or her employer/affiliate during the two years following such termination.  In determining the fees to be paid to PMCF, consideration will be given to the scope of the total engagement (including discreet segments commenced after termination of the former staff member's employment), the time incurred on the engagement during such two year period in relationship to the total time incurred on the engagement (both before and after such termination of employment), amounts billed on the engagement and amounts collected (both before and after such termination) from clients.  Payment of this amount will be due to PMCF as soon as the PMCF share is reasonably determinable.  The staff member agrees to cooperate with PMCF in determining this amount.

No breach will be deemed to have occurred if the staff member did not directly or indirectly participate in any solicitation of such client or was not directly or indirectly responsible for the client becoming a client of the former staff member (or related entity) so long as the former staff member performs no professional services for such client within two years of termination from PMCF.  PMCF, in the sole discretion of its Board, may waive or reduce the amount of the required payment for the breach upon consideration of the circumstances and effects of such waiver or adjustment.  If the staff member requests, the PMCF Board (or its designees) will meet and discuss such waiver or adjustment, without either party being further obligated.

For purposes of this Agreement, a "PMCF Client" is any person or entity (including their successors, assigns, and predecessors) for which during the 24 months preceding such termination: PMCF provided services towards or for a fee; PMCF had meaningful discussions intended to lead to an engagement contract for services; or the Firm provided services toward or for a fee (whether or not related to PMCF services) and the staff member gained access to otherwise confidential information regarding such person or entity through employment with PMCF.

**6.  Governing Law, Amendment, Waiver and Severability.**  The laws of the State of Michigan govern this Agreement.  In the event that the staff member violates the terms of any part of this Agreement, PMCF, in addition to the other remedies available to it under law including monetary damages, shall have the right to apply to any court of competent jurisdiction for an injunction restraining the staff member from further violation.  No amendment to this Agreement, nor any waiver of any right under this agreement, will be effective unless it is in writing and signed by the PMCF officer designated by the board of PMCF.  If one or more of the provisions in this Agreement shall be determined to be illegal, invalid or unenforceable, such provision shall be modified to the extent necessary to be legal, valid and enforceable or, if not capable of being modified, shall be severable while the remaining provisions will continue in full force and effect.

**7.  Arbitration.**  At the option of PMCF, any dispute or controversy arising out of or relating to this Agreement, may be settled by arbitration held in Oakland County, Michigan, following the rules then in effect of the American Arbitration Association.  The arbitrator may grant injunctive or other relief.  The decision of the arbitrator will be final, conclusive and binding on the parties.  Judgment may be entered based on the arbitrator's decision in any court having jurisdiction.  PMCF and the former staff member will each pay one-half of the arbitrator's costs and expenses, and each will separately pay their respective legal fees, expert fees and related expenses

I AGREE TO THE TERMS OF THIS AGREEMENT AND AM SIGNING IT IN CONSIDERATION OF NEW OR CONTINUING EMPLOYMENT BY PMCF.  THIS AGREEMENT WILL SURVIVE THE TERMINATION OF MY

FS-RA 10/14/02

10/04/02
EMPLOYMENT, WHICH I AGREE IS AT-WILL, AND THIS AGREEMENT MAY BE TERMINATED ONLY WITH THE
WRITTEN CONSENT OF AN OFFICER OF PMCF DESIGNATED BY THE PMCF BOARD.

Signature of Staff Member

Signature of PMCF representative

Date

Date

PS-RA 10-11-02

# EXHIBIT B

## MD MEMBER AGREEMENT

THIS MD MEMBER AGREEMENT ("Agreement") is made and executed as of the 1st day of July, 2007, by and between MICHAEL F. PAPARELLA ("Paparella"), P&M HOLDING GROUP, LLP, a Delaware limited liability partnership ("PM") and P&M CORPORATE FINANCE, L.L.C., a Michigan limited liability company ("Company").

### RECITALS:

The parties desire to set forth certain rights Paparella, PM or the Company will have upon the occurrence of specified events.

Paparella and the Company are parties to a certain Unit Purchase Agreement of even date herewith and Paparella there under agreed to be bound by the terms, conditions, duties and obligations of the Operating Agreement of the Company dated effective July 1, 2002 (the "Operating Agreement"). All Units owned by Paparella will be subject to the terms of this Agreement.

### THEREFORE IT IS AGREED:

### ARTICLE 1
#### GENERAL RESTRICTIONS

1.1    Voluntary Transfers. In accordance with the Operating Agreement, Paparella will not sell, encumber, transfer, assign or otherwise dispose of all or any part of his Units except as might otherwise be specifically permitted by this Agreement. However, Paparella may transfer all or a part of his Units to an inter vivos trust which by its terms provides that he is the grantor, trustee and beneficiary of all of the trust income and wherein he retains for his life the power to revoke the trust in full. However, any such transfer shall not be effective unless the trustee agrees to comply with the terms of this Agreement and also agrees that the rights of PM and the Company with respect to the Units will remain in effect as if Paparella had not made such transfer. For example, the trustee must sell the Units upon the death of Paparella.

1.2    Involuntary Transfers.    If any part or all of the Units owned by

Paparella are subjected to a disposition involuntarily made by him (including, but without limitation, transfers pursuant to operation of law, divorce, judicial process, and to proceedings in bankruptcy or receivership. whether voluntarily or involuntarily) ("Involuntary Transfer"), Paparella shall be deemed to have offered all of his Units to PM effective the day when PM has actual knowledge of such Involuntary Transfer.

1.2.1 The deemed offer will be to sell Paparella's Units at the price which would be payable under Section 2.2 of this Agreement for them if Paparella had ceased to be a Managing Director other than by reason of death or disability. Within sixty (60) days after such deemed offer date, PM shall notify Paparella if it accepts such deemed offer. Any such involuntary transferee shall be deemed to have irrevocably appointed Paparella as such transferee's, agent for purposes of the notice to be given by PM.

1.2.2 The purchase price for the Units sold will be paid in the manner and at the times specified in Section 2.1.1.

1.2.3 The closing of the purchase shall be on or before the 30th day following PM's acceptance of the deemed offer at a time, place and date specified by notice from PM to Paparella.

1.2.4 If PM purchases Paparella's Units pursuant to this Section 1.2, then during the time Paparella continues to render services to the Company, the provisions of Articles 5 and 6 shall apply to him as will those provisions of the Michigan Limited Liability Company Act relating to the duties of members and managers although he is no longer a member of the Company. The time periods applicable in Article 5 shall begin instead on the date of the involuntary transfer of Units and end two (2) years after Paparella ceases to be a Managing Director.

## ARTICLE 2
### CERTAIN PURCHASE EVENTS

2.1    **Death, Disability or Normal Retirement.** PM shall purchase all of Paparella's Units upon Paparella's death, the completion of his Disability Determination Period or his Normal Retirement Date. Subject to Article 8, the Executive Board will determine that Paparella is disabled and the termination of

2

838233 1

Disability. As of July 1, 2007, Paparella will be deemed to have accumulated zero (0) months of disability for this purpose. Paparella's Normal Retirement Date is the date he ceases being a Managing Director of the Company after having attained age fifty-five (55). He must terminate his status as a Managing Director upon attainment of age sixty-two (62).

2.1.1 The purchase price for the Units sold will be paid by the payment of the amount of Paparella's Unrecovered Capital Account (or the purchase price if less than Paparella's Unrecovered Capital Account) at the closing, with the balance being paid in eighty-three (83) equal monthly installments, plus interest at the Announced Rate, redetermined quarterly, with the payments due on the tenth (10th) day of each month beginning with the second calendar month following the closing.

2.1.2 The closing of the purchase will be on the tenth (10th) day of the second full month following Paparella's death or the end of his Disability Determination Period or the date of his Normal Retirement at a time, place and date specified by notice from PM to Paparella.

2.1.3 The price to be paid for Paparella's Units on his death, disability or Normal Retirement will be the product of Paparella's pro-rata share (based on Unit ownership) and the Company Value as determined under Section 3.1, such product reduced by the factors, if any are applicable, described in Section 3.2.

2.1.4 During Paparella's first six (6) months of disability, his base "compensation" (as otherwise determined) will be continued reduced by any payments payable under any group disability income insurance policy sponsored by the Company or PM under which Paparella is an insured ("Company Paid Disability Income"). In addition, the Company may pay to Paparella such additional "compensation" as is determined by the Executive Board to be appropriate based on the Company's normal Managing Director evaluation system.

2.1.5 After Paparella has incurred six (6) cumulative months of disability and during his successive disability periods (but not in excess of a cumulative three and one-half (3 1/2) years of disability) he will receive as a

3

tentative share of the Company's net profits seventy-five (75%) percent of the amount he would have been allocated as base "compensation" had he not been disabled. This tentative amount will be reduced by the Company Paid Disability Income. For example, if at the time Paparella is disabled for more than six (6) months there are four (4) Managing Directors, and if the base "compensation" amount is One Hundred Fifty Thousand and 00/100 (S150,000.00) Dollars each and if the Company profits prior to Managing Director Compensation are at least One Million Two Hundred Thousand and 00/100 ($1,200,000.00) Dollars, Paparella would receive One Hundred Twelve Thousand Five Hundred and 00/100 ($112,500.00) Dollars ($600,000 x .75 x .25), less the amount of Company Paid Disability Income. If the Company profits were One Million and 00/100 ($1,000,000.00) Dollars, Paparella would receive Ninety-Three Thousand Seven Hundred Fifty and 00/100 ($93,750.00) Dollars ($500,000.00 x .75 x .25), less the amount of Company Paid Disability Income. (That is, at the time of this Agreement, full Managing Director's base "compensation" is the lesser of one-half of Company's profits or $150,000.00).

2.2     **Other Terminations.** If Paparella withdraws from the Company or his Managing Director status is terminated pursuant to Article 7 prior to his death, the end of his Disability Determination Period or his Normal Retirement Date or his services are terminated by the Company for just cause prior to such date, PM shall purchase all of Paparella's Units. The price to be paid for Paparella's Units will be the amounts that would have been payable under Section 2.1.3 above. Payment of the purchase price will be made in the manner described in Section 2.1.1, with the closing occurring at a time determined by PM which will not be later than sixty (60) days after the withdrawal or termination date, at a time, place and date specified by notice from PM to Paparella.

2.3     **Limitation on Payments.**

     a.     The total annual payments (other than payments of Unrecovered Capital Accounts) in a Fiscal Year to all former Managing Directors or their successors under this Article 2 (or similar provisions in other MD Member Agreements) will not exceed twelve (12%) percent of the prior Fiscal Year's income for the Company. For this purpose, income is production basis income before deducting compensation for Managing Directors. However,

4

836233-1

no former Managing Director's (or successor's) payments under this Article 2, will be reduced by more than fifty (50%) percent. Subject to the foregoing, the reduction for each former Managing Director (or successor) will be his or her pro-rata portion of the reduction based on the Article 2 payments to be made to him or her compared to the total of all such payments.

b.     Any such reduction will be carried forward, without interest, and paid after the normal Article 2 payments have been made in subsequent years. The oldest carryover payment will be made first and proportionately with all other payments due from the same period. The aggregate of the normal Article 2 payment for a year and the carryover payments to that year is subject to the twelve (12%) percent limitation for that year. Carryover payments will expire if not payable by the end of the fourth Fiscal Year after the year originally due.

2.4     **PM Option.** At PM's option, after the occurrence of an event requiring it to purchase Paparella's shares, it may terminate its obligation to purchase Paparella's shares under this Article so long as the Members other than PM and other than Paparella have agreed, with Paparella's consent, to purchase Paparella's Units pro-rata among them at the price and on the terms otherwise required by PM.

2.5     **Exceptions.** Except in connection with events described in Sections 4.1, 4.3 or 4.4, if two (2) or more Managing Directors who own fifteen (15%) percent or more of the Units withdraw from the Company prior to their death, the end of their Disability Determination Period or their Normal Retirement Date within three (3) months of each other, then PM may elect to not purchase the Units of such Managing Directors and to rescind the purchase of Units with respect to other Managing Directors who have withdrawn during such time period. (In the interests of clarity, a Managing Director whose Units have been purchased by reason of death, disability or Normal Retirement has not "withdrawn" from the Company; therefore, the purchase of his or her Units is not subject to rescission under this provision.) If PM elects to do so, then it will have twelve (12) months within which to sell all of the Units in the Company or its business to a third party on such terms and conditions as it determines in its discretion.     If it has not completed such sale within the twelve (12) month period, then PM shall again be required to purchase the Units of the withdrawn Managing Directors. During the period there is any such suspended purchase obligation, the withdrawn Managing Directors will continue as non-voting Members, but they will not be entitled to any compensation

5

or other service-based payments nor have any authority to bind the Company.

## ARTICLE 3
### UNIT PURCHASE PRICE

3.1    Company Value.  Except as reduced by Section 3.2, the Company value is determined by the formula:

$$CV = \frac{(1.25 \times RA) + (4 \times IA)}{2}$$

Where:

CV = Company Value

RA =  Average revenue of Company for the four (4) fiscal years prior to the event giving rise to the purchase

IA =  Average income of Company (determined after any income allocations to Managing Directors) for the four (4) fiscal years prior to the event giving rise to the purchase

However, if the event giving rise to the purchase occurs during the last two (2) months of a fiscal year, that fiscal year and the three (3) prior fiscal years shall be used in determining such averages in lieu of the four (4) prior fiscal years.

If Paparella's disability is the triggering event, the fiscal years to be used will be the years preceding the end of the full Disability Determination Period.

The multiples contained in the formula (i.e. 1.25 and 4) will be reviewed by PM, Paparella and all other MD Members as of July 1, 2008 and each four (4) years thereafter to determine the effect of then current market conditions. If PM and the holders of a majority of the Units held by MD Members agree on the appropriate multiples, this Agreement and all other MD Member Agreements will be deemed amended accordingly. If such agreement cannot be reached, and if the larger multiple is more than ten (10%) percent above the lower multiple, arbitration under Article 8 will be used to determine the appropriate multiples. If the larger multiple is ten (10%) percent or less above the lower multiple, the average of the two (2) would apply.

6

    3.2    **Reductions.** The amount determined by multiplying the Company Value by Paparella's pro-rata share ownership ("Initial Purchase Price Amount") is to be reduced as follows to determine the purchase price for his Units:

    3.2.1 Death or Disability. If Paparella dies or completes his Disability Determination Period prior to Normal Retirement, the Initial Purchase Price Amount in excess of the Unrecovered Capital Account will be multiplied by the following percentages with the product added to the amount of Unrecovered Capital Account to determine the actual purchase price:

| Year Ended June 30 | | Factor |
|---|---|---|
| (1) | 2008 | 10% |
| (2) | 2009 | 20% |
| (3) | 2010 | 30% |
| (4) | 2011 | 40% |
| (5) | 2012 | 50% |
| (6) | 2013 | 60% |
| (7) | 2014 | 70% |
| (8) | 2015 | 80% |
| (9) | 2016 | 90% |
| (10) | 2017 | 100% |
| | Thereafter | 100% |

    3.2.2 Otherwise. If Paparella ceases to be a Managing Director prior to his Normal Retirement other than by reason of his death or disability, the Initial Purchase Price Amount in excess of the Unrecovered Capital Account will be multiplied by the following percentages with the product added to the Unrecovered Capital Account to determine the actual purchase price:

7

Termination

| Year Ended June 30 | | Factor |
|---|---|---|
| (1) | 2008 | 0% |
| (2) | 2009 | 0% |
| (3) | 2010 | 0% |
| (4) | 2011 | 0% |
| (5) | 2012 | 0% |
| (6) | 2013 | 0% |
| (7) | 2014 | 0% |
| (8) | 2015 | 0% |
| (9) | 2016 | 0% |
| (10) | 2017 | 0% |
| (11) | 2018 | 6% |
| (12) | 2019 | 22% |
| (13) | 2020 | 38% |
| (14) | 2021 | 54% |
| (15) | 2022 | 70% |
| (16) | 2023 | 76% |
| (17) | 2024 | 82% |
| (18) | 2025 | 88% |
| (19) | 2026 | 94% |
| (20) | 2027 | 100% |
| | Thereafter | 100% |

3.2.3 Certain Valuations. In determining the value of Paparella's Units for purposes of establishing the consideration to be received by Paparella in any merger, sale or liquidation of the Company, this Section will not be considered an element of valuation.

3.2.4 Effect of Certain Disability Periods. For purposes of determining Paparella's termination date for purposes of Section 3.2.2, if Paparella has any period of disability after the date of this Agreement but does not complete a Disability Determination Period, his actual termination date will be deemed to have occurred earlier to the extent his total periods of disability aggregated more than six (6) months but less than forty-two (42) months.

8

For example, if his actual termination date is June 30, 2014, but he incurred an aggregate eighteen (18) months of disability, he will be deemed to have terminated on June 30, 2013.

## ARTICLE 4
### CERTAIN CO-SALE AND OTHER RIGHTS

4.1    Drag-Along Rights. Subject to PM first complying with Section 4.3(a), if PM approves the sale of all or substantially all of its interests in the Company or of its assets to a third person at a value equal to greater than the value that would be derived under Section 3.1 (without reduction under Section 3.2), Paparella will consent to, and raise no objections to the sale. If the proposed sale is structured as a sale of Units of the Company, Paparella will agree to sell all of his Units on the same terms and conditions as are approved by PM, without consideration of any reduction that may be otherwise required by Section 3.2.

4.2    Co-Sale Rights. Subject to PM first complying with Section 4.3, if PM receives an offer to sell any of its Units to a person who is not then a Managing Director (or who has not been elected to such status) and the acquisition of such Units (either from PM or the Company) will result in PM owning less than fifty (50%) percent of the Units, then PM will promptly notify Paparella and each other of the Managing Directors of such proposed sale.    For a period of thirty (30) days from his receipt of such notice, Paparella shall have the right to require that the purchaser of such Units acquire the same percentage of Paparella's Units as PM is selling, on the same terms and conditions, without consideration of any reduction that may be otherwise required by Section 3.2. If Paparella fails to timely exercise such right, the right shall lapse as to that purchase. After PM's interest in the Company has been reduced below fifty (50%) percent, on each subsequent proposed sale by PM, Paparella shall have the same right as provided in this Section 4.2.

### 4.3    Certain PM Transactions.

a.    If PM determines that it desires to or must dispose of its interests in the Company, it will notify Paparella and the other MD Members ("Offeree Members"). The Offeree Members will have sixty (60) days from the date of such notice to either: (i) agree to purchase the PM Units at their pro-rata share of the Company value determined under Section 3.1, payable twenty (20%) percent

9

down with the balance over eighty-four (84) months with interest at the Announced Rate: or (ii) agree with PM on a different price and/or terms for the PM Units. If the Offeree Members elect (i), PM must sell its Units at that price and on those terms. If the Offeree Members do not elect (i) and they and PM cannot agree on an alternative price and/or terms under (ii), PM may solicit offers from others for its Units, subject to Section 4.3 b. and to the Drag-Along and Co-Sale rights in Sections 4.1 and 4.2, above.

b. If PM has first complied with Section 4.3(a), then if PM approves the sale of all or substantially all of the interests in the Company or of its assets to a third party at a value less than the value that would be derived under Section 3.1 (without reduction under Section 3.2), it will notify the Offeree Members of the price and terms of the third party offer. The Offeree Members will have thirty (30) days from the date of such notice to agree to purchase the PM Units at such price and on such terms. If they do not exercise the first refusal right, PM will have sixty (60) days to complete such sale, including the sale of interests of Offeree Members who have exercised co-sale rights.

4.4     PM Change in Control.  If PM or its Partners enter into a transaction and, immediately thereafter, the PM Partners immediately prior to the transaction do not control the voting interests in the surviving parent entity, then Paparella will have the right to sell his interest to PM or its successor at the price determined by multiplying the value determined under Section 3.1 by the percentage of Units owned by Paparella immediately prior to such transaction.  Alternatively, Paparella may elect to retain his interest; in such event the factors described in Section 3.2 will be increased to the same percentage that would be applicable under Section 4.6; in addition, the two (2) year periods referenced in Sections 5.1, 5.2 and 5.6 will be reduced to six (6) months.  If PM reaches a binding agreement for such a transaction, it will notify Paparella and each of the other Managing Directors of such agreement. Paparella must notify PM within thirty (30) days after receipt of such notice if he desires to exercise the sale right if the transaction closes. If he does so, PM will pay Paparella in immediately available funds for his Units not later than five (5) days following the closing of the transaction.

4.5     Automatic Member Substitution.  If Paparella sells all or a portion of his Units pursuant to a right described in this Article, the transferee will be automatically substituted as a Member without the consent of the Company

10

Members or the Executive Board.

4.6    Special 3.2.2 Table. If there is a transaction under Sections 4.1, 4.2,
4.3 b. or 4.4 and Paparella does not sell all or substantially all of his interests
in the transaction, then in lieu of the table of percentages contained in Section 3.2.2,
the table in Schedule 4.6 will apply.

| Between June 30 | and | June 30 | Factor |
|---|---|---|---|
| (1) | 2008 | 2009 | 13.33% |
| (2) | 2009 | 2010 | 26.67% |
| (3) | 2010 | 2011 | 40.00% |
| (4) | 2011 | 2012 | 53.33% |
| (5) | 2012 | 2013 | 66.67% |
| (6) | 2013 | 2014 | 80.00% |
| (7) | 2014 | 2015 | 93.33% |
| (8) | 2015 | 2016 | 100% |
| | Thereafter | | 100% |

## ARTICLE 5
### OBLIGATIONS AFTER SALE OF UNITS

5.1    Noncompetition.    While a Member and during the two (2) years
following Paparella's sale of Units, Paparella or any Person in which he has an
interest or for whom he provides services (either directly or indirectly, whether
individually or through any entity in which, for example, he is a shareholder, creditor,
partner, employee, officer, director, manager, member or beneficiary) shall not
provide Pre-Termination Services for any Client of the Company without the
consent of the Executive Board. For purposes of this Section 5.2, a person or entity is
a Client of the Company if, during the two (2) year period prior to Paparella's sale of
Units, (a) PMCF provided Pre-Termination Services for a fee; or (b) PMCF had
meaningful discussions intended to lead to an engagement contract for Pre-
Termination Services; or (c) PM provided services for a fee and Paparella gained
access to otherwise confidential information regarding such person or entity from PM,
its affiliates or the Company. Pre-Termination Services" are those services provided

11

by PMCF immediately prior to Paparella's ceasing to render services for it.

5.2   Non-Hiring.   During the two (2) years following Paparella's sale of Units, Paparella will not directly or indirectly solicit; directly or indirectly facilitate the hiring (as an employee or otherwise) of any Solicited Person to become affiliated with or render services on his behalf or for a third party; assist any third party in the making of or preparation for such solicitation or hiring; induce such Solicited Person to terminate employment with Company; or otherwise associate in business with such Solicited Person except for the benefit of the Company. A "Solicited Person" is any (a) partner, member or employee of the Company or (b) former member or employee who was such in the Company within twelve (12) months before or after the date Paparella sold his Units.

5.3   Equitable Relief.   Paparella agrees that the injury to the Company and its Members from a breach by him of the covenants and restrictions set forth in Sections 5.1, 5.2 or 6.1 would be extremely difficult, if not impossible to adequately measure and limiting the Company's or its Members' remedies to actions at law would be inadequate. Accordingly, the Company or any of its Members will be entitled, in addition to other remedies, to institute actions for injunctive and other equitable relief.

5.4   Damages.   Among the damages recoverable by the Company for a breach of the provisions of this Article 5 are: (a) in the case of a breach of Section 5.1, (i) recovery of all salaries, commissions, income, profits and other remuneration Paparella may have derived from such activity; and (ii) in the case of activity relating to a Client or former Client of the Company, seventy-five (75%) percent of the aggregate fees attributable to the higher of: (i) Company services prior to the sale of Paparella's Units; and (ii) such services during the two (2) year period following such sale of Units by Paparella or any Person in which he has a direct or indirect interest (as an employee, independent contractor, shareholder, creditor (except for fees for services rendered), partner, manager, member or beneficiary]; and (b) in the case of a breach of Section 5.2, two hundred (200%) percent of the Solicited Person's total annualized compensation or participation (including any bonuses paid) at the time of the Solicited Person's termination from the Company. In determining the fees to be taken into account for purposes of (a), consideration will be given to the scope of the total engagement (including discrete segments commenced after the sale of the Units), the time incurred on the engagement (both before and after the sale of the Units) and amounts billed on the engagement and amounts collected

12

(both before and after the sale of the Units) from clients. The generation of services underlying the fee will be the predominant factor for purposes of this calculation. Damages may be recovered in whole or in part at the discretion of the Company, by offset against amounts otherwise payable by PM or the Company to Paparella. Such offset is not the sole method of recovering damages.

5.5     Scope. If any provision of this Article 5 or Section 6.1 is held to be unenforceable to any extent (whether by reason of geographic scope or otherwise), the provision will be deemed revised or enforceable to the extent permitted by law.

5.6     Referrals. During the two (2) year period following Paparella's sale of Units, Paparella will use his best efforts to refer to PM and its affiliates those opportunities he identifies as being within the scope of PM's and such affiliates' activities.

## ARTICLE 6
### CONFIDENTIALITY

6.1     Confidential Information. At all times. Paparella shall hold the Company's and PM's Confidential Information in strict confidence and in trust for them and shall not disclose or otherwise communicate, provide or reveal in any manner whatsoever any of the Confidential Information to any Person or use such Confidential Information without the prior written consent of the Company and PM. "Confidential Information" includes, but is not limited to, financial information, related trade secrets (including but by no means limited to the Company's or PM's business plans, methods and/or practices) and other proprietary business information of the Company or PM which may include, but is not limited to, market studies, customer and client lists, referral lists and other items relative to the business of the Company or PM. Information otherwise described in this Section will not be "Confidential Information" if it is known to the public (so long as such knowledge does not result from a breach of this Agreement by Paparella or by any other person who owes a duty of non-disclosure or non-use to the Company or PM) or if the Company's Executive Board (or its designees) waives such designation.

13

## ARTICLE 7

### TERMINATION OF MANAGING DIRECTOR STATUS

#### 7.1 Election by Managing Director.

a. Paparella may voluntarily terminate his status as a Managing Director of the Company by giving at least six (6) months written notice of his intention to do so to the Executive Board.

b. If Paparella does not give the required notice, the amount payable to him for his Units (other than his Unrecovered Capital Amount) will be reduced by twenty-five (25%) percent.

#### 7.2 Required Withdrawal.

a. If any Manager of the Executive Board determines that it is in the best interest of the Company that Paparella should withdraw as a Managing Director, such person shall submit his or her recommendation to that effect in writing, together with a statement of the reasons for such recommendation, to the Executive Board and shall send a copy of such recommendation and statement to Paparella. Among the reasons for any such recommendation are (i) the sustained performance by Paparella at a level significantly below the performance of his peers of comparable experience and seniority of the duties assigned to, and expected of, him as a Managing Director, (ii) the willful violation of his material obligations under this Agreement or (iii) any action or non-action by him which is inconsistent with the standard of personal conduct expected of a Managing Director or which would cause him, the Company, PM or any of its other affiliates to be held in public disrepute.

b. Prior to its formal consideration of such recommendation the Executive Board shall afford Paparella access to any documents relevant to the withdrawal recommendation. The Executive Board shall also afford him the opportunity to respond by a statement or statements in writing to the Executive Board to the withdrawal recommendation or to any statements, documents or other material considered by the Executive Board. If Paparella so elects, he may appear in person, accompanied by counsel if he chooses to be so represented, before a meeting of the Executive Board. The Manager

14

838233-1

recommending withdrawal, accompanied by counsel, may appear before the Executive Board to support the recommendation. Any question of procedure with respect to any aspect of the proceedings for the withdrawal of Paparella or as to the conduct of such proceedings or the compliance of such proceedings with this Section 7.2 shall be determined by a majority vote of the Executive Board (not counting Paparella if he is then an Executive Board Manager).

c. The decision of the Executive Board with respect to the recommended withdrawal, together with a statement of the reasons therefor, shall be delivered in writing to Paparella within ten (10) days after the decision of the Executive Board. If the Executive Board approves the recommendation, Paparella shall be required to withdraw as a Managing Director.

d. Paparella agrees that any decision of the Executive Board as to required withdrawal, any determination by the Executive Board of questions or issues arising under this Section 7.2, including, without limitation, questions of procedure and conduct of the proceedings and compliance with this Section 7.2, shall be final and not subject to challenge in any arbitration or other proceeding.

7.3 **Withdrawal for Cause.** If the Executive Board specifically determines that Paparella's required withdrawal is for cause, then the purchase price for Paparella's Units (other than his Unrecovered Capital Amount) will be reduced by twenty-five (25%) percent. If Paparella is a member of the Executive Board, he will not participate in this determination and the Executive Board action will be taken by a unanimous vote of the other Members of it.

# ARTICLE 8
## CLAIMS OR CONTROVERSIES

8.1 **Arbitration.** Any claim, matter, dispute or controversy arising out of the provisions of this Agreement, the interpretation thereof, and/or any matter between any of the parties to this Agreement shall be resolved through binding arbitration conducted by the American Arbitration Association ("AAA") in the Detroit metropolitan area in accordance with the Commercial Arbitration Rules of the AAA then in effect. A panel of

15

838233-1

three (3) arbitrators shall be chosen by the AAA, all of whom shall be licensed Michigan attorneys. The Circuit Court for Oakland County, Michigan shall have jurisdiction over any proceeding related to any arbitration under this Agreement and judgment on any award rendered in such arbitration may be entered in that court or in any other court having jurisdiction. Neither AAA nor the arbitrators shall have authority to conduct hearings or receive proof, except in the Detroit metropolitan area, without the consent of all parties to the claim or controversy.

8.2    Terms of Arbitration. Any and all arbitration proceedings undertaken in accordance with this Agreement shall be conducted in accordance with the following terms:

a.    Discovery shall be permitted and may be conducted by the parties as if the matter were before the Circuit Court for Oakland County, Michigan, in accordance with the Michigan Court Rules pertaining to discovery in civil actions; and the arbitrator(s) shall have the same authority as to discovery as a Circuit Court judge;

b.    All discovery shall be completed within nine (9) months from the earlier of the time an answer is first filed, or thirty (30) days after the institution of the proceeding and service on the other party, in any proceeding;

c.    The arbitrators may issue orders and grant all relief that the Circuit Court for Oakland County, Michigan could grant under the Michigan Court Rules including, but not limited to, granting interim legal and/or equitable relief, issuance of subpoenas and sanctioning the parties and/or their attorneys;

d.    All proceedings shall be conducted before and recorded by a duly licensed court reporter (the costs of which to be shared equally by the parties) whose record shall be the "official record"; and

e.    The arbitrators shall render a detailed and reasoned award, which shall include findings of fact, analysis, conclusions of law and the basis for computing any damage awards.

8.3    Other Remedies. Without prejudice to the requirement for arbitration, each party may seek provisional relief from a court of competent jurisdiction: (i) in aid

16

of such arbitration or to prevent any award sought from being rendered ineffectual; or (ii) to enforce the provisions of Articles 5 and 6.

## ARTICLE 9
### MISCELLANEOUS

9.1     **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan, without regard to any conflict of law provisions.

9.2     **Definitions**. The definitions of certain capitalized terms used throughout this Agreement are as follows:

9.2.1   "Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.

9.2.2   "Announced Rate" has the meaning given to it in the Company's Operating Agreement.

9.2.3   "Code" means the Internal Revenue Code of 1986, as amended from time to time, or any successor statute.

9.2.4   "Control" (including the terms "controlled by" and "under common control with"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly or as trustee or executor, of the power to direct or cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, as trustee or executor, by contract or otherwise, including, without limitation, the ownership, directly or indirectly, of securities having the power to elect a majority of the board of directors or similar body governing the affairs of such Person.

9.2.5   "Disability Determination Period" means a cumulative three and one-half (3 1/2) year period aggregating all of Paparella's periods he was on or deemed to be on (pursuant to Section 2.1) disability status with the Company.

17

9.2.6 "Encumbrance" means any security interest, pledge, mortgage, lien, charge, adverse claim of ownership or use, or other encumbrance of any kind.

9.2.7 "Executive Board" means the Executive Board of the Company as set forth in the Operating Agreement.

9.2.8 "Person" means any individual, partnership, firm, limited liability company, corporation, association, trust, unincorporated organization, joint venture or other legal entity or organization, as well as any syndicate or group that would be deemed to be a person under Section 13(d)(3) of the Securities Exchange Act of 1934.

9.2.9 "Unrecovered Capital Amount" means the amount paid by the MD Member for his or her interest (initially for Paparella, $324,595.00) plus or minus the amount of the cumulative net undistributed income or loss credited or debited to his or her Capital Account.

**9.3    Special Rule of Construction.** For purposes of Articles 5 and 6, the terms "Company" and "PM" include their Affiliates, except that the Company will be excluded from the definition of PM "affiliates" and PM will be excluded from the definition of Company "affiliates."

**9.4    Financial Responsibility.**    Paparella will timely file all tax returns required of him and timely pay the tax shown on the return and resulting from subsequent adjustments.   Such returns will be reviewed by a PM Partner mutually agreed to by Paparella and PM's Managing Partner. Annually, Paparella will file with the Company an affidavit that all required returns have been timely filed and all taxes have been timely paid, other than those which are the subject of good faith dispute.

**9.5    Entire Agreement.**    This Agreement, the Company's Operating Agreement and the Unit Purchase Agreement of even date herewith contain the entire understanding among the parties and supersede any previous understanding and agreements between them respecting the subject matter of this Agreement including, but not limited to, the Company's Operating Agreement dated November 21, 1995, as it may have been amended. There are no representations, agreements, arrangements, or understandings, oral or written, between or among the parties to this Agreement,

18

relating to the subject matter of this Agreement, that are not fully expressed in this Agreement, the Operating Agreement or the Unit Purchase Agreement.

9.6    **Severability.** This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules, and regulations of the jurisdictions in which the Company does business. If any provision of this Agreement or its application to any person or circumstances shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of that provision to other persons or circumstances shall not be affected by it, but rather shall be enforced to the greatest extent permitted by law.

9.7    **Notices.** Notices to a party shall be deemed to have been given when mailed, by prepaid registered or certified mail, addressed to the last address given in the Company's records or as set forth in any notice or change of address previously given in writing by the addressee to the addresser.   If a facsimile number is shown as part of a party's address, notice may also be given by facsimile, confirmed transmission, with a copy by recognized overnight courier for next business day delivery; in this case the date of notice will be the facsimile transmission date if sent prior to 3:00 PM on a business day; otherwise, the date of notice will be the next business day.

9.8    **Captions.** The section titles or captions contained in this Agreement are provided for the sake of convenience only and shall not be deemed part of the context of this Agreement.

9.9    **Assignability.** This Agreement may not be assigned by Paparella. This Agreement must be assigned by the Company in connection with a sale of substantially all of its assets.

*[Signatures follow on next page]*

IN WITNESS WHEREOF, the parties have executed this Agreement.

P&M CORPORATE FINANCE, L.L.C.,
a Michigan limited liability company


By: _____

      Philip C. Gilbert
Its:   President

Address:
P.O. Box 442
27400 Northwestern Hwy.
Southfield, MI 48037-0442
Fax: 248-223-0292


P&M HOLDING GROUP, LLP,
A Delaware limited liability partnership


By: _____

      William M. Hermann
Its:   Manager

Address:
P.O. Box 307
27400 Northwestern Hwy.
Southfield, MI 48037-0307
Fax: 248-352-2522


MICHAEL F. PAPARELLA

Address:
3643 N. Shore Drive
Akron, OH 44333

20

338233-1

# EXHIBIT B

Approved, SCAO

| STATE OF MICHIGAN | | |
|---|---|---|
| **JUDICIAL DISTRICT** | SUMMONS AND COMPLAINT | |
| Oaklan **JUDICIAL CIRCUIT** | | |
| **COUNTY PROBATE** | | |



OAKLAND COUNTY 10-107020-CK

JUDGE D. LANGFORD MORRIS
P&M CORPORATE V PAPARELLA.MIC no.

**Court address**
1200 North Telegraph Road, Pontiac, MI 48341

| Plaintiff's name(s), address(es), and telephone no(s). | | Defendant's name(s), address(es), and telephone no(s). |
|---|---|---|
| P&M Corporate Finance, LLC<br>26300 Northwestern Hwy., Ste. 120<br>Southfield, MI 48076 | v | Michael Paparella<br>3643 North Shore Drive<br>Akron, OH 44333 |

Plaintiff's attorney, bar no., address, and telephone no.
James J. Giszczak (P46917)/Dominic A. Paluzzi (P71666)
McDonald Hopkins
39533 Woodward Ave., Ste. 318
Bloomfield Hills, MI 48304
248.220.1354

**SUMMONS** NOTICE TO THE DEFENDANT: In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state). (MCR2.111[C])
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

| Issued JAN 1 9 2010 | This summons expires APR 2 0 2010 | Court clerk | RUTH JOHNSON |
|---|---|---|---|

*This summons is invalid unless served on or before its expiration date.
This document must be sealed by the seal of the court.

**COMPLAINT** *Instruction: The following is information that is required to be in the caption of every complaint and is to be completed by the plaintiff. Actual allegations and the claim for relief must be stated on additional complaint pages and attached to this form.*

**Family Division Cases**
☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.
☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.
The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

**General Civil Cases**
☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.
The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

**VENUE**

| Plaintiff(s) residence (include city, township, or village) | Defendant(s) residence (include city, township, or village) |
|---|---|
| Southfield, Michigan, Oakland County | Akron, Ohio |
| Place where action arose or business conducted<br>Southfield, Michigan, Oakland County | |

1-15-10
Date

Signature of attorney/plaintiff

If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

**MC 01** (3/08) **SUMMONS AND COMPLAINT** MCR 2.102(B)(11), MCR 2.104, MCR 2.105, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206(A)

# EXHIBIT C

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF

OAKLAND COUNTY **10-107020-CK**

JUDGE D. LANGFORD MORRIS
P&M CORPORATE v PAPARELLA,MI

P&M CORPORATE FINANCE, LLC,

Plaintiff,

Case No. 10-          -CK

v.

Hon.

MICHAEL PAPARELLA,

Defendant.

---

**McDONALD HOPKINS PLC**
By: **James J. Giszczak (P46917)**
       **Dominic A. Paluzzi (P71666)**
39533 Woodward Ave., Ste. 318
Bloomfield Hills, MI 48304
248-220-1354
*jgiszczak@mcdonaldhopkins.com*
*dpaluzzi@mcdonaldhopkins.com*
**Attorneys for Plaintiff**

---

## PLAINTIFF'S MOTION FOR
## TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff, P&M Corporate Finance, LLC ("PMCF"), moves this Court pursuant to MCR

3.310 to issue a Temporary Restraining Order and a Preliminary Injunction enjoining Defendant

Michael Paparella from misappropriating PMCF's trade secrets and confidential information and

from breaching, and continuing to breach, his agreements with PMCF and his fiduciary duties.

PMCF's Motion is based on its Verified Complaint, Exhibits attached thereto, as well as the

accompanying Brief.

**WHEREFORE** PMCF requests the relief set forth in the Verified Complaint in the form

of a temporary restraining order and preliminary injunction.

{2007226;}

## BRIEF IN SUPPORT

### I. INTRODUCTION

Michael Paparella's ("Paparella") employment with PMCF's direct competitor, Candlewood Partners, LLC ("Candlewood") in breach of the non-competition and non-solicitation provisions of his agreements, and misappropriation of PMCF's confidential, proprietary and trade secret information – in direct violation of the Michigan Uniform Trade Secret Act – are causing serious and irreparable harm to PMCF. While investigating his activities, PMCF discovered Paparella's misappropriation: He has taken PMCF's confidential, proprietary and trade secret documents relative to clients, prospects and projects that Paparella was intimately engaged in while employed with PMCF, and in fact, he has misappropriated hardcopy files of recent proposals, hot prospects and projects that Paparella was actively engaged in. Moreover, upon information and belief, Paparella has solicited at least two of PMCF's clients on behalf of Candlewood. These wrongful acts of Paparella have been calculated to illegally misappropriate PMCF's trade secrets and undercut PMCF's competitive position and client goodwill.

Accordingly, PMCF has no option but to seek injunctive relief from this Court in an effort to protect its contractual interests, its confidential, proprietary, and trade secret business information, as well as its client relationships and goodwill. Because PMCF has no adequate remedy at law for its injuries, which will continue and be aggravated in the future unless Paparella is restrained, PMCF is entitled to a temporary restraining order and preliminary injunction to prevent further harm.

{2007226:}

2

## II. STATEMENT OF FACTS

### A.    Paparella's Employment with PMCF.

PMCF is an investment banking advisory firm that provides services on a global basis. (Verified Complaint ("Compl."), ¶ 6.) PMCF hired Paparella on or about June 21, 2004. At that time, Paparella was hired as a Director of PMCF. During his employment with PMCF, PMCF trained Paparella in its confidential and proprietary processes and procedures involved in providing investment banking advisory services, and provided him exposure to the following industries: skilled nursing care; rehabilitation and physical therapy facilities, assisted living; pharmacy management companies, pharmacies, physician practices and physician practice management firms; nursing homes; long term care facilities; business services; data management and storage; business process outsourcing; facilities management; collection agencies and firms; title; real estate liquidation and disposition; casting; forging; stamping; precision machining; extrusion; metal fabrication including the production of tanks, cylinders and vessels; steel production including bar; distribution of industrial components and materials; general contracting; road building and construction; concrete production; concrete distribution; production and fabrication of concrete components, HVAC contracting; electrical contracting; medical device production; medical device design, diagnostic testing, plastics companies including injection molding, blow molding, extrusion, distribution, and sheet production, producers of capital equipment and goods, retailers, developers and distributors of software. In his capacity as Director at PMCF, Paparella was responsible for, among other things, building, maintaining and developing relationships with PMCF's clients and prospective clients, as well as developing, updating and implementing PMCF's confidential and proprietary processes and procedures. Paparella was also charged with developing and maintaining relationships with

{2007226:}

3

prospective acquirers, financing sources, capital sources, referral sources, attorneys, bankers, equity funds, and subordinated debt providers, all on behalf of PMCF. (Compl., ¶ 7.)

At the time he began his employment with PMCF, and in consideration for that employment, Paparella executed a P&M Corporate Finance Staff-Relationship Agreement ("Relationship Agreement") with PMCF. A true and accurate copy of Paparella's Relationship Agreement is attached as **Exhibit A** and is incorporated herein by reference. Pursuant to the Relationship Agreement, Paparella agreed, in part, as follows:

> 1. Confidentiality. During the term of the staff member's employment by PMCF and at all times thereafter, the staff member agrees to not directly or indirectly disclose to anyone, or use or otherwise exploit for the benefit of anyone other than PMCF of the Firm, PMCF's or the Firm's trade secrets, client lists, supplier lists, marketing arrangements, business plans, projections, software, patents, inventions, financial information, personnel manuals, training manuals, pricing manuals, product and service development plans, market strategies, checklists, templates, spreadsheets, financial models, databases, internal performance statistics and other competitive sensitive information concerning PMCF or the Firm, whether or not in written, tangible or any other form. The staff member also agrees to not directly or indirectly disclose to anyone, or use or otherwise exploit for the benefit of anyone other than PMCF or the Firm any information obtained from, or related to a client. These restrictions do not apply to such information which is known to the public so long as such knowledge does not result from a breach of any provision of this Agreement by the staff member or from a breach by any other person who owes a duty of non-disclosure or non-use to PMCF or the Firm.

> 2. Protected Information. Any programs, inventions, patents, software, ideas, methods, plans, improvements, products or other confidential information that are developed at PMCF or the Firm prior to and/or during the staff member's employment are rightfully the property of PMCF or the Firm. Upon severance of employment for any reason, any such Protected Information and any record the staff member may have of such Protected Information will be delivered over to your supervisor. The staff member makes no claim whatsoever to the ownership of such Protected Information and will not during the staff member's employment with PMCF or the Firm or at any time thereafter use the Protected Information except in connection with PMCF's or the Firm's business.

> All workpapers, records, programs, designs, patents, business plans, financial statements, manuals, checklists, templates, spreadsheets, financial models, databases, memoranda, lists and other property created by, delivered to or compiled by the staff member by or on behalf of PMCF or the Firm or its

{2007226:}

4

representatives, vendors or customers which pertain to the business of PMCF or the Firm shall be and remain the property of PMCF or the Firm and be subject at all times to its discretion and control. Likewise, all correspondence, reports, records, charts, advertising materials and other similar data pertaining to PMCF's or the Firm's business, activities or future plans which are collected by the staff member shall be delivered promptly to the staff member's supervisor without request upon termination of the staff member's employment and thereafter.

Database information otherwise covered by this Section 2 is not Protected Information if (a) it is known to the public (so long as such knowledge does not result from a breach of any provision of this Agreement by the former staff member or from a breach by any other person who owes a duty of non-disclosure or non-use to PMCF or the Firm) and except for names and contact information was not generated by PMCF or its staff or; (b) if the PMCF Board (or its designees) waives such designation.

\* \* \*

5.     Client Solicitation. During the staff member's employment and during the two year period thereafter the staff member shall not, directly or indirectly, render investment banking services, including merger and acquisition advisory, valuation advisory, financing and capital sourcings, strategic advisory, or targeted acquisition search, other than as a bona fide, full-time employee of a client, to any PMCF Client.

If there is a breach of this Section 5, then in addition to any other relief available to PMCF and the Firm, the former staff member shall pay to PMCF an amount equal to 75% of the aggregate fees attributable to (a) PMCF services prior to the termination of the staff member's services with PMCF and (b) services by the former staff member and his or her employer/affiliate during the two years following such termination. In determining the fees to be paid to PMCF, consideration will be given to the scope of the total engagement (including discreet segments commenced after termination of the former staff member's employment), the time incurred on the engagement during such two year period in relationship to the total time incurred on the engagement (both before and after such termination of employment), amounts billed on the engagement and amounts collected (both before and after such termination) from clients. Payment of this amount will be due to PMCF as soon as the PMCF share is reasonably determinable. The staff member agrees to cooperate with PMCF in determining this amount.

\* \* \*

For purposes of this Agreement, a "PMCF Client" is any person or entity (including their successors, assigns and predecessors) for which during the 24 months preceding such termination: PMCF provided services towards or for a fee; PMCF had meaningful discussions intended to lead to an engagement contract for

{2007226:}

services; or the Firm provided services toward or for a fee (whether or not related to PMCF services) and the staff member gained access to otherwise confidential information regarding such person or entity through employment with PMCF.

6. Governing Law, Amendment, Waiver and Severability. The laws of the State of Michigan govern this Agreement. In the event that the staff member violates the terms of any part of this Agreement, PMCF, in addition to the other remedies available to it under law including monetary damages, shall have the right to apply to any court of competent jurisdiction for an injunction restraining the staff member from further violation. No amendment to this Agreement, nor any waiver of any right under this agreement, will be effective unless it is in writing and signed by the PMCF officer designated by the board of PMCF. If one or more of the provisions in this Agreement shall be determined to be illegal, invalid, or unenforceable, such provision shall be modified to the extent necessary to be legal, valid and enforceable or, if not capable of being modified, shall be severable while the remaining provisions will continue in full force and effect. [**Exhibit A**, "Relationship Agreement".]

(Compl., ¶¶ 8-9.)

On or about July 1, 2007, Paparella was promoted to Managing Director ("MD"), and became a Member and owner of PMCF. (Compl., ¶ 10.) At that time, Paparella agreed to the terms of the PMCF MD Member Agreement ("Member Agreement"), attached hereto as **Exhibit B**, which included, but was not limited to, similar confidentiality and client solicitation restrictions and the following terms, in addition to the terms of the existing Relationship Agreement:

a. Paparella agreed to a 5% prorated profit and loss partnership interest;

b. Paparella agreed to an annual managing director income allocation as determined by the Board of Directors prorated based on actual months of service for any member who was not an active member for the full fiscal year; and

c. Paparella agreed to contribute a required HR-10 Pension Contribution each fiscal year.

(Compl., ¶ 11.)

During the course of his employment with PMCF, Paparella had access to and utilized on a regular basis PMCF's most confidential and proprietary information, including, but not limited

{2007226:}

6

to, financial models, industry research, industry reports and related data, proposals, information concerning the industries referenced above, information regarding particular projects, presentations, growth plan summaries, engagement documents, selling memoranda, offering memoranda, buyers list and private equity hot lists, confidentiality agreements, management presentations, service agreements, client lists, prospect lists, operational procedures, PMCF's business affairs, marketing and sales strategies and practices, and pricing and contractual details for clients. (Compl., ¶ 12.)

Paparella acquired intimate knowledge concerning PMCF's clients' and prospective clients' needs, preferences and service needs. He had extensive contact with PMCF's clients and prospects. The information that Paparella was exposed to and utilized on a daily basis is housed on PMCF's computer servers, which are located in Michigan. (Compl.,¶ 13.) PMCF provided Paparella with extensive training and knowledge of PMCF's business processes, strategic planning and marketing strategies. In addition, Paparella traveled to Michigan to attend meetings during which he gained knowledge of and training as to PMCF's confidential business information. (Compl.,¶ 14.)

## B. Paparella's Resignation from PMCF and Employment with Candlewood.

On or about April 1, 2009, Paparella withdrew as a Member of PMCF and returned to the status of staff member with PMCF as Entity Principal and Managing Director. (Compl.,¶ 15.) Paparella submitted his voluntary resignation from PMCF on September 3, 2009, and Paparella's employment with PMCF terminated effective September 8, 2009. (Compl.,¶ 16.) Paparella returned his computer to PMCF on September 11, 2009, eights days after his resignation. (Compl.,¶ 17.)

The information to which Paparella was exposed is of great value not only to PMCF, but also to its competitors who do not possess, or have access to, this information. For this reason,

{2007226.}

7

PMCF takes reasonable steps to insure that its information stays confidential. Such measures include the use of anti-piracy, non-solicitation and confidentiality agreements, password protection and access to information on a need-to-know basis, and other security measures. (Compl.,¶ 18.)

Recently, PMCF discovered that Paparella is working as a Managing Director for Candlewood Partners, LLC ("Candlewood") in its Cleveland, Ohio office, and appears to be utilizing PMCF's confidential and proprietary information that he misappropriated. Candlewood is a direct competitor providing the same or similar services as those provided by PMCF. Although Candlewood is a direct competitor of PMCF, Candlewood would not have access to PMCF's confidential and proprietary documents and information. (Compl.,¶ 19.)

In the course of investigating Paparella's computer activities, it was discovered that Paparella misappropriated PMCF confidential, proprietary and trade secret documents, relative to clients, prospects and projects that Paparella was intimately engaged in while employed with PMCF. (Compl.,¶ 20.) Moreover, upon information and belief, Paparella misappropriated hardcopy files of recent proposals, hot prospects and projects that Paparella was actively engaged in. (Compl.,¶ 21.)

Upon information and belief, Paparella has solicited and is providing services to PMCF's prospects and/or clients, including, but not limited to American Ring, Collinwood Concrete, and Wrayco Industries, on behalf of Candlewood. (Compl.,¶ 22.) While employed by PMCF, Paparella also provided competitors proposed business plans, identifying the PMCF clients and deals he would improperly bring if hired by those competitors. (Compl.,¶ 23.) In addition, prior to returning his PMCF computer to PMCF, Paparella deliberately attempted to wipe his hard drive in an effort to conceal his improper conduct. (Compl.,¶ 24.) The confidential and

proprietary and trade secret information to which Paparella had access and misappropriated will directly aid his employment with a direct competitor. (Compl.,¶ 25.)

## C. The Irreparable Harm to PMCF.

As a direct result of Paparella's actions, PMCF is faced with the substantial risk that Paparella will continue to unlawfully use its confidential, proprietary and trade secret information, as well as that of its clients, to PMCF's competitive disadvantage., As the result of Paparella's actions, PMCF has suffered and will continue to suffer irreparable harm. In his new employment, Paparella will necessarily be called upon to use the trade secrets and confidential information that he misappropriated, as he has already demonstrated via his solicitation of clients and/or prospective clients. Such use and disclosure is inevitable, and has already occurred. (Compl.,¶ 26.) PMCF lacks an adequate remedy at law to address the substantial and irreparable harm that it is suffering as a result of Paparella's actions. (Compl.,¶ 27.)

On December 9, 2009, PMCF provided Paparella a break-down of the amounts he owed PMCF as agreed upon as a member of PMCF. Paparella has not paid the amounts owed. (Compl.,¶ 37.)

## III. ARGUMENT

Pursuant to MCR 3.310(B), a temporary restraining order may be granted where "immediate and irreparable injury, loss or damage will result to the applicant from the delay required to effect notice." The Michigan Supreme Court, in *Niedzialek v Barbers Union*, 331 Mich 296; 49 NW2d 273 (1951), explained the basis for such temporary injunctive relief:

In granting or withholding injunctive relief pendente lite in a case of this character it is highly proper and quite essential for a court to consider whether the rights of the respective litigants will best be subserved by granting temporary injunctive relief if sought. **If the personal rights or property rights involved will be best preserved by granting temporary injunctive relief in a suit presenting issues of controverted merit, such relief should be granted.** [331 Mich at 300-01 (emphasis supplied) (citation omitted).]

{2007226·}

9

Through his new employment with Candlewood, Paparella will be using PMCF's confidential and proprietary information and property that he has stolen to compete directly with PMCF. Through his unlawful conduct, it is clear that Paparella will use PMCF's property to damage PMCF's client goodwill and competitive position. As discussed below, even if Paparella had a change of heart and intended to move forward with the utmost good faith, Paparella cannot prevent, absent appropriate injunctive relief, his knowledge of PMCF's confidential information from showing up in his work. *Lowry Computer Products, Inc v Head*, 984 F Supp 1111, 1116 (ED Mich 1997). (If defendant "is working for a direct competitor in a similar area, his knowledge is bound to have a significant impact on Lowry's business.") Once this information has been divulged, it cannot be retrieved. This is particularly true here because Paparella was entrusted with PMCF's most sensitive information.

The object of a preliminary injunction is to preserve the status quo, without injury to either party, until final adjudication. *Niedzialek*, 331 Mich at 301. Issuance of an injunction involves a four factor analysis: (1) the strength of the applicant's demonstration that the applicant is likely to prevail on the merits; (2) demonstration that the applicant will suffer irreparable injury if a Preliminary Injunction is not granted; (3) whether harm to the applicant in the absence of a stay outweighs harm to the opposing party if a stay is granted; and (4) harm to the public interest if an injunction issues. *See MSEA v Dep't of Mental Health*, 421 Mich 152, 157-58; 365 NW2d 93 (1984). Each of these factors weighs strongly in favor of immediate injunctive relief.

Unless immediately restrained by this Court, Paparella will carry out his wrongful acts and continue to cause PMCF irreparable harm and injury. Accordingly, PMCF respectfully requests that this Court issue a Temporary Restraining Order, and then issue a Preliminary Injunction, enjoining Defendant from continuing his violative conduct.

{2007226:}

10

## A. PMCF Will Prevail on the Merits.

### 1. Paparella Has Breached His Enforceable Agreements with PMCF and His Fiduciary Duties.

PMCF will prevail on the merits of its Complaint because there is no dispute that Paparella's misappropriation of PMCF's confidential information and trade secrets, along with his breach of the client solicitation and non-competition provisions, constitute breaches of contract and fiduciary duties. In order to establish a breach of contract, PMCF must demonstrate: (1) a valid, enforceable contract; (2) the defendant breached the contract by either refusing to perform or failing to perform in conformity with the contract's requirements; and (3) damages resulted from the breach. *See Woody v Tamer,* 158 Mich App 764; 405 NW2d 213 (1987). All of the elements are satisfied in this case. Paparella agreed to non-solicitation and non-competition covenants in his Agreements prohibiting him from soliciting PMCF's clients for two years after his employment with PMCF. Paparella also agreed to a confidentiality clause in his Agreements. Paparella's recent solicitation of two PMCF clients and his misappropriation of PMCF's confidential information and trade secrets are blatant breaches of his enforceable Agreements with PMCF.

Michigan law provides that "reasonable" covenants not to compete against employees should be enforced. *Rehmann, Robson & Co v McMahan*, 187 Mich App 36, 46; 466 NW2d 325 (1991). MCL § 445.774a provides:

Sec. 4a. (1) An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business. To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

{2007226:}

11

*Id.* (emphasis added).

Indeed, the Court of Appeals of Michigan has already analyzed a non-solicitation clause nearly identical to the one contained in Paparella's Agreement and found it to be reasonable and enforceable. In *Rooyakker & Sitz, PLLC v Plante & Moran, PLLC*, 276 Mich. App. 146 (2007), the court found the non-solicit restriction reasonable as to scope since "the clause merely prevents the individual plaintiffs from acting as accountants for former clients of Plante & Moran; it does not preclude them from performing accounting services." *Id.* at 158. Moreover, the court found the restriction reasonable in terms of duration. "The clause only prohibited the individual plaintiffs from soliciting or providing services to Plante & Moran's clients for a two year period." *Id.*

### a.  The Agreements Protect PMCF's Legitimate Business Interests.

The fact that Paparella's Agreements protect PMCF's legitimate business interests cannot be disputed. Employers have legitimate business interests, for example, in restricting former employees from soliciting its customers, *Merrill Lynch, Inc v Gall*, 836 F Supp 428, 433-34 (WD Mich 1993); and in protecting confidential and proprietary information, such as customer lists, profit margins, corporate strategies, and pricing schemes. *Lowry*, 984 F Supp at 1116; *Superior Consultant Co, Inc v Walling*, 851 F Supp 839, 847-48 (ED Mich 1994); *Merrill Lynch, Inc v Ran*, 67 F Supp 2d 764, 775 (ED Mich 1999). Because Paparella had access to, and utilized on a regular basis, PMCF's most confidential information and was granted extensive customer contact, there is no dispute that PMCF has the requisite protectable interests.

### b.  The Restrictions in the Agreements are Reasonably Tailored to Protect PMCF.

As for reasonableness, in this case, the non-competition and non-solicitation obligations could not be narrower. Paparella is restricted from soliciting PMCF's customers for a period of

two years from the termination of his employment. It prohibits Paparella only from rendering services to PMCF clients within the areas of investment banking services, including merger and acquisition advisory, valuation advisory, financing and capital sourcings, strategic advisory, or targeted acquisition search. Paparella, therefore, has many opportunities to provide a plethora of other services to PMCF clients and is not unduly restricted from gaining a livelihood by the Agreements. Moreover, Paparella is free to provide these restricted services to non-PMCF clients.

With respect to the time limitation, two years is also reasonable. Michigan courts have consistently held that covenants with such durations are reasonable and enforceable. Indeed, far longer periods of time have been upheld. *See, e.g., Lowry*, 984 F Supp at 1116 (finding one year reasonable and emphasizing that "as to duration, courts have upheld time periods of six months to *three years*."); *Bristol Window & Door, Inc v Hoogenstyn*, 250 Mich App 478; 650 NW2d 670 (2002) (enforcing a three-year, statewide non-competition agreement executed by an independent sales representative). Therefore, the duration of two years in Paparella's Agreements is more than reasonable and necessary to protect PMCF's customer goodwill, competitive edge, and confidential and trade secret information.[1]

In view of the above stated case law, it is clear that the non-compete and non-solicit obligations in the Agreements between Paparella and PMCF are legally enforceable under Michigan law.

---

[1] The Court may enforce the agreement to the extent the contract is unreasonable by substituting reasonable terms for those omitted or found to be unreasonable. Under Michigan law, courts are permitted to modify overbroad covenants to the extent needed to protect the employer's legitimate interests. MCL § 445.774a(1); *Rehman*, 187 Mich App at 46.

{2007226:}

c.   **Paparella Has Blatantly Violated His Reasonable Agreements.**

There is no dispute that Paparella violated his Relationship Agreement and Member Agreement with PMCF. Paparella agreed that for two years after leaving PMCF's employment, he would not solicit any PMCF client in the industries in which he worked while employed with PMCF. He also agreed that he would not disclose or use PMCF's confidential information.

Recently, PMCF discovered that Paparella is working as a Managing Director for Candlewood in its Cleveland, Ohio office, and appears to be utilizing PMCF's confidential and proprietary information that he misappropriated. Candlewood is a direct competitor providing the same or similar services as those provided by PMCF. Upon information and belief, Paparella has solicited PMCF's clients, including, but not limited to American Ring and Collinwood, on behalf of Candlewood.

In the course of investigating Paparella's computer activities, it was discovered that Paparella misappropriated hundreds of PMCF confidential, proprietary and trade secret documents, relative to clients, prospects and projects that Paparella was intimately engaged in while employed with PMCF. Moreover, upon information and belief, Paparella misappropriated hardcopy files of recent proposals, hot prospects and projects that Paparella was actively engaged in.

d.   **Paparella Has Violated His Fiduciary Duties.**

Paparella's use of PMCF's confidential information constitutes a breach of fiduciary duty. *See, e.g., Chemtrend Inc v McCarthy*, 780 F Supp 463 (ED Mich 1991); Restatement 2d Agency, §396(b). Paparella has fiduciary duties to PMCF because he was placed in a position of trust and confidence with regard to PMCF's trade secrets and confidential information. Paparella has fiduciary obligations not to use or disclose this information upon termination of his employment. Paparella's solicitation of PMCF's clients on behalf of Candlewood and his use of

{2007226:}

PMCF's confidential information and trade secrets therefore constitute a breach of fiduciary duty.

Because Paparella has stolen PMCF's documents, PMCF also will prevail on its claims of conversion and unjust enrichment. A plaintiff in a trade-secret misappropriation case can recover damages for the actual loss caused by the misappropriation, as well as the unjust enrichment caused by the misappropriation that is not taken into account by the actual-loss calculation. *Mike's Train House, Inc v Lionel, LLC*, 472 F3d 398, 415 (6th Cir 2006) (citing MCL § 445.1904).

## B. If Preliminary Injunctive Relief Is Not Granted, PMCF Will Suffer Irreparable Injury.

PMCF will suffer irreparable harm if a preliminary injunction is not granted. In discussing irreparable harm, the Michigan Supreme Court has noted that:

> An injury to be irreparable need not be such as to render its repair physically impossible; but it is irreparable when it cannot be adequately compensated in damages, or when there exists no certain pecuniary standard for the measurement of damages due to the nature of the right or property injured.

*Ainsworth v Hunting & Fishing Club*, 153 Mich 185; 116 NW 99 (1908) (citations omitted). Similarly, Judge Cohn, in *Superior v Walling*, 851 F Supp 839, 847 (ED Mich 1994), stated that "[l]oss of customer goodwill and fair competition can support a finding of irreparable harm. Such losses are difficult to calculate." *Id* at 847. The court in *Lowry* also held that the disclosure of confidential, proprietary information by a former employee in his new employment can (and did there) constitute irreparable harm to his former employer. 984 F Supp at 1116.

Unless enjoined by this Court, Paparella will continue to use PMCF's confidential information and trade secrets in violation of his statutory, contractual, and fiduciary duties to PMCF. As described above, Paparella acquired detailed confidential and proprietary information

{2007226:}

15

and trade secrets of PMCF. His conversion, use, and disclosure of this information will inflict irreparable harm on PMCF.

As recognized by the courts, it would be totally unreasonable to expect Paparella to work in a similar position for a direct competitor and ignore his intimate knowledge of PMCF's confidential business information. *See Lowry,* 984 F Supp at 1116 (Defendant's "knowledge is bound to have significant adverse impact on Lowry's business.") *See also Walling*, 839 F Supp at 847-48 (finding that "use of this knowledge [client confidential information] would enable [Defendant] effectively to undercut [Superior's] rates while providing the same services provided by [Superior].")

Therefore, Paparella's misappropriation of trade secrets causes PMCF irreparable harm to its client goodwill and competitive position. PMCF has no adequate remedy at law for his misconduct because the injuries that PMCF has suffered and will continue to suffer in connection with the loss of its client goodwill are so indefinite and speculative as to be incapable of exact proof. *See Chem-Trend,* 780 F Supp at 462 (finding that "it would not be possible to measure plaintiff's actual loss of customers and goodwill"); *Walling,* 851 F Supp at 847 (citing *Basicomputer Corp v Scott,* 973 F2d 507 (CA 6 1992)) (stating that damages are often irreparable because they are difficult to calculate).

## C.     The Harm to PMCF If a Preliminary Injunction Is Denied Outweighs the Harm to Paparella If It Is Granted.

The injunction requested by PMCF only prohibits Paparella from soliciting clients or prospects of PMCF in the area of investment banking, in specific industries, and from using PMCF's confidential information and trade secrets, and from avoiding his contractual and other obligations. It merely prevents Paparella from committing wrongful acts that interfere with PMCF's contractual and property rights. Paparella is free to seek employment that will not

{2007226·}

16

involve the use or disclosure of PMCF's trade secrets and confidential information. If an injunction is not ordered, the loss to PMCF of client goodwill or any confidential information is incalculable. Therefore, the harm to PMCF should this Court deny a preliminary injunction far outweighs the harm to Paparella should it be granted. *See Walling, supra.*

**D.    The Public Interest Supports the Issuance of a Preliminary Injunction.**

The public interest in protecting confidential information and enforcing valid contracts justifies preliminary injunctive relief. If the courts do not enjoin parties from violating their agreements or MUTSA, then the statutes become a dead letter. *Id.*

The public also has an interest in proper adjudication of disputes. The object of a preliminary injunction is "to preserve the status quo (*i.e.*, the uncontested status which precedes the pending controversy)." *Detroit v Salaried Phys, UAW*, 165 Mich App 142, 151; 418 NW2d 679 (1987). In this case, the status quo to be preserved is the status that preceded Paparella's misappropriation of PMCF's confidential business information and Paparella's breach of contract. A preliminary injunction would simply insure that no further injury will result to PMCF pending a final hearing on the merits. Thus, the public interest supports not only the enforcement of MUTSA and reasonable agreements, but also the enjoining of violations prior to a trial.

## IV.  CONCLUSION

Based on the foregoing, PMCF requests that this Court grant the injunctive relief requested in the Verified Complaint in the form of a temporary restraining order and preliminary injunction.

Respectfully submitted,

**McDONALD HOPKINS PLC**

By: _____
    **James J. Giszczak (P46917)**
    **Dominic A. Paluzzi (P71666)**
39533 Woodward Ave., Suite 318
Bloomfield Hills, MI 48304
(248) 220-1354
Dated: January 15, 2010      **Attorneys for Plaintiff**

# EXHIBIT A

### P&M CORPORATE FINANCE
### STAFF – RELATIONSHIP AGREEMENT

The core purpose of P&M Corporate Finance LLC, ("PMCF") is "To be a caring, professional firm deeply committed to our clients' success." For purposes of this Agreement, PMCF, P&M Holding Group, LLP and all related entities, current and future, are the "Firm". Our two greatest assets are our clients and our staff. We are committed to hiring the best staff members to serve our clients and to providing our staff members with the appropriate training and resources to accomplish our core purpose. We invest substantial training time and dollars in our staff and commit resources to developing the client/staff relationship which is so vital to the fulfillment of our core purpose. If a staff member leaves PMCF, PMCF needs to protect this investment, as well as its intellectual capital. As such, we have agreed to require the execution of this Relationship Agreement.

PMCF agrees to employ Mike Paparella as a staff member and Mike Paparella accepts such employment on an at-will basis. Therefore, employment may be terminated by either party to this Agreement at any time for any reason, with or without notice, with or without cause.

The staff member shall devote time, energy, and efforts to the practice of PMCF and shall do such work as may be required by PMCF subject to the instruction and policies of PMCF as they now stand or may from time to time be determined by PMCF, and represents to PMCF that there are no undisclosed legal restrictions from any prior employment, whether imposed by contract or law, that would limit the ability to do so.

As compensation for the staff member's services, PMCF shall pay the staff member the agreed to semi-monthly base salary on the fifteenth and on the last day of the month. Benefits will also be provided as outlined in the Personnel Manual as amended from time to time including the addition or termination of one or more benefits.

Because client relationships are valuable and unique assets to PMCF, and because these relationships are developed and nurtured through PMCF support, resources, expertise and training, the staff member agrees:

1. __Confidentiality.__ During the term of the staff member's employment by PMCF and at all times thereafter, the staff member agrees to not directly or indirectly disclose to anyone, or use or otherwise exploit for the benefit of anyone other than PMCF or the Firm, PMCF's or the Firm's trade secrets, client lists, supplier lists, marketing arrangements, business plans, projections, software, patents, inventions, financial information, personnel manuals, training manuals, pricing manuals, product and service development plans, market strategies, checklists, templates, spreadsheets, financial models, databases, internal performance statistics and other competitive sensitive information concerning PMCF or the Firm, whether or not in written, tangible or any other form. The staff member also agrees to not directly or indirectly disclose to anyone, or use or otherwise exploit for the benefit of anyone other than PMCF or the Firm any information obtained from, or related to a client. These restrictions do not apply to such information which is known to the public so long as such knowledge does not result from a breach of any provision of this Agreement by the staff member or from a breach by any other person who owes a duty of non-disclosure or non-use to PMCF or the Firm.

2. __Protected Information.__ Any programs, inventions, patents, software, ideas, methods, plans, improvements, products or other confidential information that are developed at PMCF or the Firm prior to and/or during the staff member's employment are rightfully the property of PMCF or the Firm. Upon severance of employment for any reason, any such Protected Information and any record the staff member may have of such Protected Information will be delivered over to your supervisor. The staff member makes no claim whatsoever to the ownership of such Protected Information and will not during the staff member's employment with PMCF or the Firm or at any time thereafter use the Protected Information except in connection with PMCF's or the Firm's business.

All workpapers, records, programs, designs, patents, business plans, financial statements, manuals, checklists, templates , spreadsheets, financial models, databases, memoranda, lists and other property created by, delivered to or compiled by the staff member by or on behalf of PMCF or the Firm or its representatives, vendors or customers which pertain to the business of PMCF or the Firm shall be and remain the property of PMCF or the Firm and be subject at all times to its discretion and control. Likewise, all correspondence, reports, records, charts, advertising materials and other similar data pertaining to PMCF's or the Firm's business, activities or future plans which are collected by the staff member shall be delivered promptly to the staff member's supervisor without request upon termination of the staff member's employment and thereafter.

Database information otherwise covered by this Section 2 is not Protected Information if (a) it is known to the public (so long as such knowledge does not result from a breach of any provision of this Agreement by the former staff member or from a breach by any other person who owes a duty of non-disclosure or non-use to PMCF or the Firm) and except for names and contact information was not generated by PMCF or its staff or; (b) if the PMCF Board (or its designees) waives such designation.

3. __Business Information.__ If during the period of employment with PMCF or the Firm the staff member develops any programs, inventions, patents, software, checklists, templates, spreadsheets, financial models, databases, ideas, methods, plans, improvements, products or other confidential information that does or might relate to PMCF's business, including potential new lines of business, the staff member shall disclose such Business Information to PMCF in writing and PMCF shall have the right, without the payment of any further consideration to the staff member, to adopt such Business Information for its own use. Such business information belongs solely to PMCF whether used by PMCF or not.

10/04/02

**4.  Solicitation of Staff Members.**  During the staff member's employment with PMCF and during the twenty four months thereafter, neither the staff member nor any of the staff member's employers, associates or affiliates will solicit any staff member of PMCF or the Firm for the purpose of inducing such staff member to terminate the staff member's employment with PMCF or the Firm or hire or otherwise associate in business with any such staff member without prior written consent from PMCF and the Firm's Human Resource Director.  This restriction includes solicitation of staff members while working as an external recruiter for a professional search firm.  If there is a breach of this provision, the staff member shall pay to PMCF, as liquidated damages, 100 percent of a solicited staff member's total annualized compensation (current base salary plus most recent bonus paid) at the time of the staff member's termination from PMCF.  Payment will be due within 30 days after the solicited staff member's termination date.

No breach will be deemed to have occurred if the staff member has no direct or indirect involvement with the recruitment of the individual.  The determination of this involvement will be at the sole discretion of PMCF and the Human Resource Director of the Firm.

**5.  Client Solicitation.**  During the staff member's employment and during the two year period thereafter the staff member shall not, directly or indirectly, render investment banking services, including merger and acquisition advisory, valuation advisory, financing and capital sourcing, strategic advisory, or targeted acquisition search, other than as a bona fide, full-time employee of a client, to any PMCF Client.

If there is a breach of this Section 5, then in addition to any other relief available to PMCF and the Firm, the former staff member shall pay to PMCF an amount equal to 75% of the aggregate fees attributable to (a) PMCF services prior to the termination of the staff member's services with PMCF and (b) services by the former staff member and his or her employer/affiliate during the two years following such termination.  In determining the fees to be paid to PMCF, consideration will be given to the scope of the total engagement (including discreet segments commenced after termination of the former staff member's employment), the time incurred on the engagement during such two year period in relationship to the total time incurred on the engagement (both before and after such termination of employment), amounts billed on the engagement and amounts collected (both before and after such termination) from clients.  Payment of this amount will be due to PMCF as soon as the PMCF share is reasonably determinable.  The staff member agrees to cooperate with PMCF in determining this amount.

No breach will be deemed to have occurred if the staff member did not directly or indirectly participate in any solicitation of such client or was not directly or indirectly responsible for the client becoming a client of the former staff member (or related entity) so long as the former staff member performs no professional services for such client within two years of termination from PMCF.  PMCF, in the sole discretion of its Board, may waive or reduce the amount of the required payment for the breach upon consideration of the circumstances and effects of such waiver or adjustment.  If the staff member requests, the PMCF Board (or its designees) will meet and discuss such waiver or adjustment, without either party being further obligated.

For purposes of this Agreement, a "PMCF Client" is any person or entity (including their successors, assigns, and predecessors) for which during the 24 months preceding such termination: PMCF provided services towards or for a fee; PMCF had meaningful discussions intended to lead to an engagement contract for services; or the Firm provided services toward or for a fee (whether or not related to PMCF services) and the staff member gained access to otherwise confidential information regarding such person or entity through employment with PMCF.

**6.  Governing Law, Amendment, Waiver and Severability.**  The laws of the State of Michigan govern this Agreement.  In the event that the staff member violates the terms of any part of this Agreement, PMCF, in addition to the other remedies available to it under law including monetary damages, shall have the right to apply to any court of competent jurisdiction for an injunction restraining the staff member from further violation.  No amendment to this Agreement, nor any waiver of any right under this agreement, will be effective unless it is in writing and signed by the PMCF officer designated by the board of PMCF.  If one or more of the provisions in this Agreement shall be determined to be illegal, invalid or unenforceable, such provision shall be modified to the extent necessary to be legal, valid and enforceable or, if not capable of being modified, shall be severable while the remaining provisions will continue in full force and effect.

**7.  Arbitration.**  At the option of PMCF, any dispute or controversy arising out of or relating to this Agreement, may be settled by arbitration held in Oakland County, Michigan, following the rules then in effect of the American Arbitration Association.  The arbitrator may grant injunctive or other relief.  The decision of the arbitrator will be final, conclusive and binding on the parties.  Judgment may be entered based on the arbitrator's decision in any court having jurisdiction.  PMCF and the former staff member will each pay one-half of the arbitrator's costs and expenses, and each will separately pay their respective legal fees, expert fees and related expenses

I AGREE TO THE TERMS OF THIS AGREEMENT AND AM SIGNING IT IN CONSIDERATION OF NEW OR CONTINUING EMPLOYMENT BY PMCF.  THIS AGREEMENT WILL SURVIVE THE TERMINATION OF MY

PS-RA  10/11/02

10/04/02
EMPLOYMENT, WHICH I AGREE IS AT-WILL, AND THIS AGREEMENT MAY BE TERMINATED ONLY WITH THE
WRITTEN CONSENT OF AN OFFICER OF PMCF DESIGNATED BY THE PMCF BOARD.

_____
Signature of Staff Member

_____
Signature of PMCF representative

_____
Date

_____
Date

PN-B A 10-11-02

# EXHIBIT B

## MD MEMBER AGREEMENT

THIS MD MEMBER AGREEMENT ("Agreement") is made and executed as of the 1st day of July, 2007, by and between MICHAEL F. PAPARELLA ("Paparella"), P&M HOLDING GROUP, LLP, a Delaware limited liability partnership ("PM") and P&M CORPORATE FINANCE, L.L.C., a Michigan limited liability company ("Company").

### RECITALS:

The parties desire to set forth certain rights Paparella, PM or the Company will have upon the occurrence of specified events.

Paparella and the Company are parties to a certain Unit Purchase Agreement of even date herewith and Paparella there under agreed to be bound by the terms, conditions, duties and obligations of the Operating Agreement of the Company dated effective July 1, 2002 (the "Operating Agreement"). All Units owned by Paparella will be subject to the terms of this Agreement.

### THEREFORE IT IS AGREED:

## ARTICLE 1
### GENERAL RESTRICTIONS

1.1    Voluntary Transfers.   In accordance with the Operating Agreement, Paparella will not sell, encumber, transfer, assign or otherwise dispose of all or any part of his Units except as might otherwise be specifically permitted by this Agreement.  However, Paparella may transfer all or a part of his Units to an inter vivos trust which by its terms provides that he is the grantor, trustee and beneficiary of all of the trust income and wherein he retains for his life the power to revoke the trust in full.  However, any such transfer shall not be effective unless the trustee agrees to comply with the terms of this Agreement and also agrees that the rights of PM and the Company with respect to the Units will remain in effect as if Paparella had not made such transfer. For example, the trustee must sell the Units upon the death of Paparella.

1.2    Involuntary Transfers.    If any part or all of the Units owned by

Paparella are subjected to a disposition involuntarily made by him (including, but without limitation, transfers pursuant to operation of law, divorce, judicial process, and to proceedings in bankruptcy or receivership. whether voluntarily or involuntarily) ("Involuntary Transfer"). Paparella shall be deemed to have offered all of his Units to PM effective the day when PM has actual knowledge of such Involuntary Transfer.

1.2.1 The deemed offer will be to sell Paparella's Units at the price which would be payable under Section 2.2 of this Agreement for them if Paparella had ceased to be a Managing Director other than by reason of death or disability. Within sixty (60) days after such deemed offer date, PM shall notify Paparella if it accepts such deemed offer. Any such involuntary transferee shall be deemed to have irrevocably appointed Paparella as such transferee's, agent for purposes of the notice to be given by PM.

1.2.2 The purchase price for the Units sold will be paid in the manner and at the times specified in Section 2.1.1.

1.2.3 The closing of the purchase shall be on or before the 30th day following PM's acceptance of the deemed offer at a time, place and date specified by notice from PM to Paparella.

1.2.4 If PM purchases Paparella's Units pursuant to this Section 1.2, then during the time Paparella continues to render services to the Company, the provisions of Articles 5 and 6 shall apply to him as will those provisions of the Michigan Limited Liability Company Act relating to the duties of members and managers although he is no longer a member of the Company. The time periods applicable in Article 5 shall begin instead on the date of the involuntary transfer of Units and end two (2) years after Paparella ceases to be a Managing Director.

## ARTICLE 2
### CERTAIN PURCHASE EVENTS

2.1 **Death, Disability or Normal Retirement**. PM shall purchase all of Paparella's Units upon Paparella's death, the completion of his Disability Determination Period or his Normal Retirement Date. Subject to Article 8, the Executive Board will determine that Paparella is disabled and the termination of

2

Disability. As of July 1, 2007, Paparella will be deemed to have accumulated zero (0) months of disability for this purpose. Paparella's Normal Retirement Date is the date he ceases being a Managing Director of the Company after having attained age fifty-five (55). He must terminate his status as a Managing Director upon attainment of age sixty-two (62).

2.1.1 The purchase price for the Units sold will be paid by the payment of the amount of Paparella's Unrecovered Capital Account (or the purchase price if less than Paparella's Unrecovered Capital Account) at the closing, with the balance being paid in eighty-three (83) equal monthly installments, plus interest at the Announced Rate, redetermined quarterly, with the payments due on the tenth (10th) day of each month beginning with the second calendar month following the closing.

2.1.2 The closing of the purchase will be on the tenth (10th) day of the second full month following Paparella's death or the end of his Disability Determination Period or the date of his Normal Retirement at a time, place and date specified by notice from PM to Paparella.

2.1.3 The price to be paid for Paparella's Units on his death, disability or Normal Retirement will be the product of Paparella's pro-rata share (based on Unit ownership) and the Company Value as determined under Section 3.1, such product reduced by the factors, if any are applicable, described in Section 3.2.

2.1.4 During Paparella's first six (6) months of disability, his base "compensation" (as otherwise determined) will be continued reduced by any payments payable under any group disability income insurance policy sponsored by the Company or PM under which Paparella is an insured ("Company Paid Disability Income"). In addition, the Company may pay to Paparella such additional "compensation" as is determined by the Executive Board to be appropriate based on the Company's normal Managing Director evaluation system.

2.1.5 After Paparella has incurred six (6) cumulative months of disability and during his successive disability periods (but not in excess of a cumulative three and one-half (3 1/2) years of disability) he will receive as a

3

338233-1

tentative share of the Company's net profits seventy-five (75%) percent of the amount he would have been allocated as base "compensation" had he not been disabled. This tentative amount will be reduced by the Company Paid Disability Income. For example, if at the time Paparella is disabled for more than six (6) months there are four (4) Managing Directors, and if the base "compensation" amount is One Hundred Fifty Thousand and 00/100 (\$150,000.00) Dollars each and if the Company profits prior to Managing Director Compensation are at least One Million Two Hundred Thousand and 00/100 (\$1,200,000.00) Dollars, Paparella would receive One Hundred Twelve Thousand Five Hundred and 00/100 (\$112,500.00) Dollars (\$600,000 x .75 x .25), less the amount of Company Paid Disability Income. If the Company profits were One Million and 00/100 (\$1,000,000.00) Dollars, Paparella would receive Ninety-Three Thousand Seven Hundred Fifty and 00/100 (\$93,750.00) Dollars (\$500,000.00 x .75 x .25), less the amount of Company Paid Disability Income. (That is, at the time of this Agreement, full Managing Director's base "compensation" is the lesser of one-half of Company's profits or \$150,000.00).

2.2     **Other Terminations.** If Paparella withdraws from the Company or his Managing Director status is terminated pursuant to Article 7 prior to his death, the end of his Disability Determination Period or his Normal Retirement Date or his services are terminated by the Company for just cause prior to such date, PM shall purchase all of Paparella's Units. The price to be paid for Paparella's Units will be the amounts that would have been payable under Section 2.1.3 above. Payment of the purchase price will be made in the manner described in Section 2.1.1, with the closing occurring at a time determined by PM which will not be later than sixty (60) days after the withdrawal or termination date, at a time, place and date specified by notice from PM to Paparella.

### 2.3     Limitation on Payments.

a.     The total annual payments (other than payments of Unrecovered Capital Accounts) in a Fiscal Year to all former Managing Directors or their successors under this Article 2 (or similar provisions in other MD Member Agreements) will not exceed twelve (12%) percent of the prior Fiscal Year's income for the Company. For this purpose, income is production basis income before deducting compensation for Managing Directors. However,

4

no former Managing Director's (or successor's) payments under this Article 2, will be reduced by more than fifty (50%) percent. Subject to the foregoing, the reduction for each former Managing Director (or successor) will be his or her pro-rata portion of the reduction based on the Article 2 payments to be made to him or her compared to the total of all such payments.

b.      Any such reduction will be carried forward, without interest, and paid after the normal Article 2 payments have been made in subsequent years. The oldest carryover payment will be made first and proportionately with all other payments due from the same period. The aggregate of the normal Article 2 payment for a year and the carryover payments to that year is subject to the twelve (12%) percent limitation for that year. Carryover payments will expire if not payable by the end of the fourth Fiscal Year after the year originally due.

2.4     **PM Option**. At PM's option, after the occurrence of an event requiring it to purchase Paparella's shares, it may terminate its obligation to purchase Paparella's shares under this Article so long as the Members other than PM and other than Paparella have agreed, with Paparella's consent, to purchase Paparella's Units pro-rata among them at the price and on the terms otherwise required by PM.

2.5     **Exceptions**. Except in connection with events described in Sections 4.1, 4.3 or 4.4, if two (2) or more Managing Directors who own fifteen (15%) percent or more of the Units withdraw from the Company prior to their death, the end of their Disability Determination Period or their Normal Retirement Date within three (3) months of each other, then PM may elect to not purchase the Units of such Managing Directors and to rescind the purchase of Units with respect to other Managing Directors who have withdrawn during such time period. (In the interests of clarity, a Managing Director whose Units have been purchased by reason of death, disability or Normal Retirement has not "withdrawn" from the Company; therefore, the purchase of his or her Units is not subject to rescission under this provision.) If PM elects to do so, then it will have twelve (12) months within which to sell all of the Units in the Company or its business to a third party on such terms and conditions as it determines in its discretion. If it has not completed such sale within the twelve (12) month period, then PM shall again be required to purchase the Units of the withdrawn Managing Directors. During the period there is any such suspended purchase obligation, the withdrawn Managing Directors will continue as non-voting Members, but they will not be entitled to any compensation

5

or other service-based payments nor have any authority to bind the Company.

## ARTICLE 3
### UNIT PURCHASE PRICE

3.1 Company Value. Except as reduced by Section 3.2, the Company value is determined by the formula:

$$CV = \frac{(1.25 \times RA) + (4 \times IA)}{2}$$

Where:

CV = Company Value

RA = Average revenue of Company for the four (4) fiscal years prior to the event giving rise to the purchase

IA = Average income of Company (determined after any income allocations to Managing Directors) for the four (4) fiscal years prior to the event giving rise to the purchase

However, if the event giving rise to the purchase occurs during the last two (2) months of a fiscal year, that fiscal year and the three (3) prior fiscal years shall be used in determining such averages in lieu of the four (4) prior fiscal years.

If Paparella's disability is the triggering event, the fiscal years to be used will be the years preceding the end of the full Disability Determination Period.

The multiples contained in the formula (i.e. 1.25 and 4) will be reviewed by PM, Paparella and all other MD Members as of July 1, 2008 and each four (4) years thereafter to determine the effect of then current market conditions. If PM and the holders of a majority of the Units held by MD Members agree on the appropriate multiples, this Agreement and all other MD Member Agreements will be deemed amended accordingly. If such agreement cannot be reached, and if the larger multiple is more than ten (10%) percent above the lower multiple, arbitration under Article 8 will be used to determine the appropriate multiples. If the larger multiple is ten (10%) percent or less above the lower multiple, the average of the two (2) would apply.

6

**3.2** Reductions. The amount determined by multiplying the Company Value by Paparella's pro-rata share ownership ("Initial Purchase Price Amount") is to be reduced as follows to determine the purchase price for his Units:

3.2.1 Death or Disability. If Paparella dies or completes his Disability Determination Period prior to Normal Retirement, the Initial Purchase Price Amount in excess of the Unrecovered Capital Account will be multiplied by the following percentages with the product added to the amount of Unrecovered Capital Account to determine the actual purchase price:

| Year Ended June 30 | Factor |
| --- | --- |
| (1) 2008 | 10% |
| (2) 2009 | 20% |
| (3) 2010 | 30% |
| (4) 2011 | 40% |
| (5) 2012 | 50% |
| (6) 2013 | 60% |
| (7) 2014 | 70% |
| (8) 2015 | 80% |
| (9) 2016 | 90% |
| (10) 2017 | 100% |
| Thereafter | 100% |

3.2.2 Otherwise. If Paparella ceases to be a Managing Director prior to his Normal Retirement other than by reason of his death or disability, the Initial Purchase Price Amount in excess of the Unrecovered Capital Account will be multiplied by the following percentages with the product added to the Unrecovered Capital Account to determine the actual purchase price:

7

Termination

| Year Ended June 30 | | Factor |
|---|---|---|
| (1) | 2008 | 0% |
| (2) | 2009 | 0% |
| (3) | 2010 | 0% |
| (4) | 2011 | 0% |
| (5) | 2012 | 0% |
| (6) | 2013 | 0% |
| (7) | 2014 | 0% |
| (8) | 2015 | 0% |
| (9) | 2016 | 0% |
| (10) | 2017 | 0% |
| (11) | 2018 | 6% |
| (12) | 2019 | 22% |
| (13) | 2020 | 38% |
| (14) | 2021 | 54% |
| (15) | 2022 | 70% |
| (16) | 2023 | 76% |
| (17) | 2024 | 82% |
| (18) | 2025 | 88% |
| (19) | 2026 | 94% |
| (20) | 2027 | 100% |
| | Thereafter | 100% |

3.2.3 Certain Valuations. In determining the value of Paparella's Units for purposes of establishing the consideration to be received by Paparella in any merger, sale or liquidation of the Company, this Section will not be considered an element of valuation.

3.2.4 Effect of Certain Disability Periods. For purposes of determining Paparella's termination date for purposes of Section 3.2.2, if Paparella has any period of disability after the date of this Agreement but does not complete a Disability Determination Period, his actual termination date will be deemed to have occurred earlier to the extent his total periods of disability aggregated more than six (6) months but less than forty-two (42) months.

8

For example, if his actual termination date is June 30, 2014, but he incurred an aggregate eighteen (18) months of disability, he will be deemed to have terminated on June 30, 2013.

## ARTICLE 4
## CERTAIN CO-SALE AND OTHER RIGHTS

4.1     **Drag-Along Rights**. Subject to PM first complying with Section 4.3(a), if PM approves the sale of all or substantially all of its interests in the Company or of its assets to a third person at a value equal to greater than the value that would be derived under Section 3.1 (without reduction under Section 3.2), Paparella will consent to, and raise no objections to the sale. If the proposed sale is structured as a sale of Units of the Company, Paparella will agree to sell all of his Units on the same terms and conditions as are approved by PM, without consideration of any reduction that may be otherwise required by Section 3.2.

4.2     **Co-Sale Rights**. Subject to PM first complying with Section 4.3, if PM receives an offer to sell any of its Units to a person who is not then a Managing Director (or who has not been elected to such status) and the acquisition of such Units (either from PM or the Company) will result in PM owning less than fifty (50%) percent of the Units, then PM will promptly notify Paparella and each other of the Managing Directors of such proposed sale.   For a period of thirty (30) days from his receipt of such notice, Paparella shall have the right to require that the purchaser of such Units acquire the same percentage of Paparella's Units as PM is selling, on the same terms and conditions, without consideration of any reduction that may be otherwise required by Section 3.2. If Paparella fails to timely exercise such right, the right shall lapse as to that purchase. After PM's interest in the Company has been reduced below fifty (50%) percent, on each subsequent proposed sale by PM, Paparella shall have the same right as provided in this Section 4.2.

### 4.3     Certain PM Transactions.

a.     If PM determines that it desires to or must dispose of its interests in the Company, it will notify Paparella and the other MD Members ("Offeree Members"). The Offeree Members will have sixty (60) days from the date of such notice to either: (i) agree to purchase the PM Units at their pro-rata share of the Company value determined under Section 3.1, payable twenty (20%) percent

9

down with the balance over eighty-four (84) months with interest at the Announced Rate: or (ii) agree with PM on a different price and/or terms for the PM Units. If the Offeree Members elect (i), PM must sell its Units at that price and on those terms. If the Offeree Members do not elect (i) and they and PM cannot agree on an alternative price and/or terms under (ii), PM may solicit offers from others for its Units, subject to Section 4.3 b. and to the Drag-Along and Co-Sale rights in Sections 4.1 and 4.2, above.

b.     If PM has first complied with Section 4.3(a), then if PM approves the sale of all or substantially all of the interests in the Company or of its assets to a third party at a value less than the value that would be derived under Section 3.1 (without reduction under Section 3.2), it will notify the Offeree Members of the price and terms of the third party offer. The Offeree Members will have thirty (30) days from the date of such notice to agree to purchase the PM Units at such price and on such terms. If they do not exercise the first refusal right, PM will have sixty (60) days to complete such sale, including the sale of interests of Offeree Members who have exercised co-sale rights.

4.4     **PM Change in Control.** If PM or its Partners enter into a transaction and, immediately thereafter, the PM Partners immediately prior to the transaction do not control the voting interests in the surviving parent entity, then Paparella will have the right to sell his interest to PM or its successor at the price determined by multiplying the value determined under Section 3.1 by the percentage of Units owned by Paparella immediately prior to such transaction. Alternatively, Paparella may elect to retain his interest; in such event the factors described in Section 3.2 will be increased to the same percentage that would be applicable under Section 4.6; in addition, the two (2) year periods referenced in Sections 5.1, 5.2 and 5.6 will be reduced to six (6) months. If PM reaches a binding agreement for such a transaction, it will notify Paparella and each of the other Managing Directors of such agreement. Paparella must notify PM within thirty (30) days after receipt of such notice if he desires to exercise the sale right if the transaction closes. If he does so, PM will pay Paparella in immediately available funds for his Units not later than five (5) days following the closing of the transaction.

4.5     **Automatic Member Substitution.** If Paparella sells all or a portion of his Units pursuant to a right described in this Article, the transferee will be automatically substituted as a Member without the consent of the Company

10

Members or the Executive Board.

4.6 **Special 3.2.2 Table.** If there is a transaction under Sections 4.1, 4.2, 4.3 b, or 4.4 and Paparella does not sell all or substantially all of his interests in the transaction, then in lieu of the table of percentages contained in Section 3.2.2, the table in Schedule 4.6 will apply.

| | Between June 30 | and | June 30 | Factor |
|---|---|---|---|---|
| (1) | 2008 | | 2009 | 13.33% |
| (2) | 2009 | | 2010 | 26.67% |
| (3) | 2010 | | 2011 | 40.00% |
| (4) | 2011 | | 2012 | 53.33% |
| (5) | 2012 | | 2013 | 66.67% |
| (6) | 2013 | | 2014 | 80.00% |
| (7) | 2014 | | 2015 | 93.33% |
| (8) | 2015 | | 2016 | 100% |
| | Thereafter | | | 100% |

## ARTICLE 5
### OBLIGATIONS AFTER SALE OF UNITS

5.1 **Noncompetition.** While a Member and during the two (2) years following Paparella's sale of Units, Paparella or any Person in which he has an interest or for whom he provides services (either directly or indirectly, whether individually or through any entity in which, for example, he is a shareholder, creditor, partner, employee, officer, director, manager, member or beneficiary) shall not provide Pre-Termination Services for any Client of the Company without the consent of the Executive Board. For purposes of this Section 5.2, a person or entity is a Client of the Company if, during the two (2) year period prior to Paparella's sale of Units, (a) PMCF provided Pre-Termination Services for a fee; or (b) PMCF had meaningful discussions intended to lead to an engagement contract for Pre-Termination Services; or (c) PM provided services for a fee and Paparella gained access to otherwise confidential information regarding such person or entity from PM, its affiliates or the Company. Pre-Termination Services" are those services provided

11

by PMCF immediately prior to Paparella's ceasing to render services for it.

5.2 **Non-Hiring**. During the two (2) years following Paparella's sale of Units, Paparella will not directly or indirectly solicit; directly or indirectly facilitate the hiring (as an employee or otherwise) of any Solicited Person to become affiliated with or render services on his behalf or for a third party; assist any third party in the making of or preparation for such solicitation or hiring; induce such Solicited Person to terminate employment with Company; or otherwise associate in business with such Solicited Person except for the benefit of the Company. A "Solicited Person" is any (a) partner, member or employee of the Company or (b) former member or employee who was such in the Company within twelve (12) months before or after the date Paparella sold his Units.

5.3 **Equitable Relief**. Paparella agrees that the injury to the Company and its Members from a breach by him of the covenants and restrictions set forth in Sections 5.1, 5.2 or 6.1 would be extremely difficult, if not impossible to adequately measure and limiting the Company's or its Members' remedies to actions at law would be inadequate. Accordingly, the Company or any of its Members will be entitled, in addition to other remedies, to institute actions for injunctive and other equitable relief.

5.4 **Damages**. Among the damages recoverable by the Company for a breach of the provisions of this Article 5 are: (a) in the case of a breach of Section 5.1, (i) recovery of all salaries, commissions, income, profits and other remuneration Paparella may have derived from such activity; and (ii) in the case of activity relating to a Client or former Client of the Company, seventy-five (75%) percent of the aggregate fees attributable to the higher of: (i) Company services prior to the sale of Paparella's Units; and (ii) such services during the two (2) year period following such sale of Units by Paparella or any Person in which he has a direct or indirect interest [as an employee, independent contractor, shareholder, creditor (except for fees for services rendered), partner, manager, member or beneficiary]; and (b) in the case of a breach of Section 5.2, two hundred (200%) percent of the Solicited Person's total annualized compensation or participation (including any bonuses paid) at the time of the Solicited Person's termination from the Company. In determining the fees to be taken into account for purposes of (a), consideration will be given to the scope of the total engagement (including discrete segments commenced after the sale of the Units), the time incurred on the engagement (both before and after the sale of the Units) and amounts billed on the engagement and amounts collected

12

(both before and after the sale of the Units) from clients. The generation of services underlying the fee will be the predominant factor for purposes of this calculation. Damages may be recovered in whole or in part at the discretion of the Company, by offset against amounts otherwise payable by PM or the Company to Paparella. Such offset is not the sole method of recovering damages.

5.5    Scope. If any provision of this Article 5 or Section 6.1 is held to be unenforceable to any extent (whether by reason of geographic scope or otherwise), the provision will be deemed revised or enforceable to the extent permitted by law.

5.6    Referrals. During the two (2) year period following Paparella's sale of Units, Paparella will use his best efforts to refer to PM and its affiliates those opportunities he identifies as being within the scope of PM's and such affiliates' activities.

## ARTICLE 6
## CONFIDENTIALITY

6.1    Confidential Information. At all times, Paparella shall hold the Company's and PM's Confidential Information in strict confidence and in trust for them and shall not disclose or otherwise communicate, provide or reveal in any manner whatsoever any of the Confidential Information to any Person or use such Confidential Information without the prior written consent of the Company and PM. "Confidential Information" includes, but is not limited to, financial information, related trade secrets (including but by no means limited to the Company's or PM's business plans, methods and/or practices) and other proprietary business information of the Company or PM which may include, but is not limited to, market studies, customer and client lists, referral lists and other items relative to the business of the Company or PM. Information otherwise described in this Section will not be "Confidential Information" if it is known to the public (so long as such knowledge does not result from a breach of this Agreement by Paparella or by any other person who owes a duty of non-disclosure or non-use to the Company or PM) or if the Company's Executive Board (or its designees) waives such designation.

13

## ARTICLE 7
### TERMINATION OF MANAGING DIRECTOR STATUS

#### 7.1 Election by Managing Director.

a. Paparella may voluntarily terminate his status as a Managing Director of the Company by giving at least six (6) months written notice of his intention to do so to the Executive Board.

b. If Paparella does not give the required notice, the amount payable to him for his Units (other than his Unrecovered Capital Amount) will be reduced by twenty-five (25%) percent.

#### 7.2 Required Withdrawal.

a. If any Manager of the Executive Board determines that it is in the best interest of the Company that Paparella should withdraw as a Managing Director, such person shall submit his or her recommendation to that effect in writing, together with a statement of the reasons for such recommendation, to the Executive Board and shall send a copy of such recommendation and statement to Paparella. Among the reasons for any such recommendation are (i) the sustained performance by Paparella at a level significantly below the performance of his peers of comparable experience and seniority of the duties assigned to, and expected of, him as a Managing Director, (ii) the willful violation of his material obligations under this Agreement or (iii) any action or non-action by him which is inconsistent with the standard of personal conduct expected of a Managing Director or which would cause him, the Company, PM or any of its other affiliates to be held in public disrepute.

b. Prior to its formal consideration of such recommendation the Executive Board shall afford Paparella access to any documents relevant to the withdrawal recommendation. The Executive Board shall also afford him the opportunity to respond by a statement or statements in writing to the Executive Board to the withdrawal recommendation or to any statements, documents or other material considered by the Executive Board. If Paparella so elects, he may appear in person, accompanied by counsel if he chooses to be so represented, before a meeting of the Executive Board. The Manager

14

recommending withdrawal, accompanied by counsel, may appear before the Executive Board to support the recommendation. Any question of procedure with respect to any aspect of the proceedings for the withdrawal of Paparella or as to the conduct of such proceedings or the compliance of such proceedings with this Section 7.2 shall be determined by a majority vote of the Executive Board (not counting Paparella if he is then an Executive Board Manager).

c. The decision of the Executive Board with respect to the recommended withdrawal, together with a statement of the reasons therefor, shall be delivered in writing to Paparella within ten (10) days after the decision of the Executive Board. If the Executive Board approves the recommendation, Paparella shall be required to withdraw as a Managing Director.

d. Paparella agrees that any decision of the Executive Board as to required withdrawal, any determination by the Executive Board of questions or issues arising under this Section 7.2, including, without limitation, questions of procedure and conduct of the proceedings and compliance with this Section 7.2, shall be final and not subject to challenge in any arbitration or other proceeding.

7.3  **Withdrawal for Cause.** If the Executive Board specifically determines that Paparella's required withdrawal is for cause, then the purchase price for Paparella's Units (other than his Unrecovered Capital Amount) will be reduced by twenty-five (25%) percent. If Paparella is a member of the Executive Board, he will not participate in this determination and the Executive Board action will be taken by a unanimous vote of the other Members of it.

## ARTICLE 8
## CLAIMS OR CONTROVERSIES

8.1  **Arbitration.** Any claim, matter, dispute or controversy arising out of the provisions of this Agreement, the interpretation thereof, and/or any matter between any of the parties to this Agreement shall be resolved through binding arbitration conducted by the American Arbitration Association ("AAA") in the Detroit metropolitan area in accordance with the Commercial Arbitration Rules of the AAA then in effect. A panel of

15

three (3) arbitrators shall be chosen by the AAA, all of whom shall be licensed Michigan attorneys. The Circuit Court for Oakland County, Michigan shall have jurisdiction over any proceeding related to any arbitration under this Agreement and judgment on any award rendered in such arbitration may be entered in that court or in any other court having jurisdiction. Neither AAA nor the arbitrators shall have authority to conduct hearings or receive proof, except in the Detroit metropolitan area, without the consent of all parties to the claim or controversy.

8.2    Terms of Arbitration. Any and all arbitration proceedings undertaken in accordance with this Agreement shall be conducted in accordance with the following terms:

a.    Discovery shall be permitted and may be conducted by the parties as if the matter were before the Circuit Court for Oakland County, Michigan, in accordance with the Michigan Court Rules pertaining to discovery in civil actions; and the arbitrator(s) shall have the same authority as to discovery as a Circuit Court judge;

b.    All discovery shall be completed within nine (9) months from the earlier of the time an answer is first filed, or thirty (30) days after the institution of the proceeding and service on the other party, in any proceeding;

c.    The arbitrators may issue orders and grant all relief that the Circuit Court for Oakland County, Michigan could grant under the Michigan Court Rules including, but not limited to, granting interim legal and/or equitable relief, issuance of subpoenas and sanctioning the parties and/or their attorneys;

d.    All proceedings shall be conducted before and recorded by a duly licensed court reporter (the costs of which to be shared equally by the parties) whose record shall be the "official record"; and

e.    The arbitrators shall render a detailed and reasoned award, which shall include findings of fact, analysis, conclusions of law and the basis for computing any damage awards.

8.3    Other Remedies. Without prejudice to the requirement for arbitration, each party may seek provisional relief from a court of competent jurisdiction: (i) in aid

16

A30233-1

of such arbitration or to prevent any award sought from being rendered ineffectual; or (ii) to enforce the provisions of Articles 5 and 6.

## ARTICLE 9
### MISCELLANEOUS

9.1     Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan, without regard to any conflict of law provisions.

9.2     Definitions. The definitions of certain capitalized terms used throughout this Agreement are as follows:

9.2.1   "Affiliate" means, with respect to any specified Person. any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.

9.2.2   "Announced Rate" has the meaning given to it in the Company's Operating Agreement.

9.2.3   "Code" means the Internal Revenue Code of 1986, as amended from time to time, or any successor statute.

9.2.4   "Control" (including the terms "controlled by" and "under common control with"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly or as trustee or executor, of the power to direct or cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, as trustee or executor, by contract or otherwise, including, without limitation, the ownership, directly or indirectly, of securities having the power to elect a majority of the board of directors or similar body governing the affairs of such Person.

9.2.5   "Disability Determination Period" means a cumulative three and one-half (3 1/2) year period aggregating all of Paparella's periods he was on or deemed to be on (pursuant to Section 2.1) disability status with the Company.

17

9.2.6 "Encumbrance" means any security interest, pledge, mortgage, lien, charge, adverse claim of ownership or use, or other encumbrance of any kind.

9.2.7 "Executive Board" means the Executive Board of the Company as set forth in the Operating Agreement.

9.2.8 "Person" means any individual, partnership, firm, limited liability company, corporation, association, trust, unincorporated organization, joint venture or other legal entity or organization, as well as any syndicate or group that would be deemed to be a person under Section 13(d)(3) of the Securities Exchange Act of 1934.

9.2.9 "Unrecovered Capital Amount" means the amount paid by the MD Member for his or her interest (initially for Paparella, $324,595.00) plus or minus the amount of the cumulative net undistributed income or loss credited or debited to his or her Capital Account.

**9.3 Special Rule of Construction.** For purposes of Articles 5 and 6, the terms "Company" and "PM" include their Affiliates, except that the Company will be excluded from the definition of PM "affiliates" and PM will be excluded from the definition of Company "affiliates."

**9.4 Financial Responsibility.** Paparella will timely file all tax returns required of him and timely pay the tax shown on the return and resulting from subsequent adjustments. Such returns will be reviewed by a PM Partner mutually agreed to by Paparella and PM's Managing Partner. Annually, Paparella will file with the Company an affidavit that all required returns have been timely filed and all taxes have been timely paid, other than those which are the subject of good faith dispute.

**9.5 Entire Agreement.** This Agreement, the Company's Operating Agreement and the Unit Purchase Agreement of even date herewith contain the entire understanding among the parties and supersede any previous understanding and agreements between them respecting the subject matter of this Agreement including, but not limited to, the Company's Operating Agreement dated November 21, 1995, as it may have been amended. There are no representations, agreements, arrangements, or understandings, oral or written, between or among the parties to this Agreement,

18

relating to the subject matter of this Agreement, that are not fully expressed in this Agreement, the Operating Agreement or the Unit Purchase Agreement.

9.6    **Severability.** This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules, and regulations of the jurisdictions in which the Company does business. If any provision of this Agreement or its application to any person or circumstances shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of that provision to other persons or circumstances shall not be affected by it, but rather shall be enforced to the greatest extent permitted by law.

9.7    **Notices.** Notices to a party shall be deemed to have been given when mailed, by prepaid registered or certified mail, addressed to the last address given in the Company's records or as set forth in any notice or change of address previously given in writing by the addressee to the addresser. If a facsimile number is shown as part of a party's address, notice may also be given by facsimile, confirmed transmission, with a copy by recognized overnight courier for next business day delivery; in this case the date of notice will be the facsimile transmission date if sent prior to 3:00 PM on a business day; otherwise, the date of notice will be the next business day.

9.8    **Captions.** The section titles or captions contained in this Agreement are provided for the sake of convenience only and shall not be deemed part of the context of this Agreement.

9.9    **Assignability.** This Agreement may not be assigned by Paparella. This Agreement must be assigned by the Company in connection with a sale of substantially all of its assets.

*[Signatures follow on next page]*

IN WITNESS WHEREOF, the parties have executed this Agreement.

P&M CORPORATE FINANCE, L.L.C.,
a Michigan limited liability company

By: _____  _____

     Philip C. Gilbert

Its:    President

Address:
P.O. Box 442
27400 Northwestern Hwy.
Southfield, MI 48037-0442
Fax: 248-223-0292

P&M HOLDING GROUP, LLP,
A Delaware limited liability partnership

By: _____

     William M. Hermann

Its:    Manager

Address:
P.O. Box 307
27400 Northwestern Hwy.
Southfield, MI 48037-0307
Fax: 248-352-2522

_____

MICHAEL F. PAPARELLA

Address:
3643 N. Shore Drive
Akron, OH 44333

70

338233-1

# EXHIBIT D

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

P&M CORPORATE FINANCE, LLC,

    Plaintiff,

v.

MICHAEL PAPARELLA,

    Defendant.

*OAKLAND*
*COUNTY* **10-107020-CK**

JUDGE D. LANGFORD MORRIS
P & M CORPORA v PAPARELLA,MIC

---

**McDONALD HOPKINS PLC**
By: **James J. Giszczak (P46917)**
  **Dominic A. Paluzzi (P71666)**
39533 Woodward Ave., Ste. 318
Bloomfield Hills, MI 48304
248-220-1354
*jgiszczak@mcdonaldhopkins.com*
*dpaluzzi@mcdonaldhopkins.com*
**Attorneys for Plaintiff**

---

### ORDER TO SHOW CAUSE

At a session of this Court held in the City of Pontiac,
County of Oakland, State of Michigan on:

PRESENT: HON. _____

The Court having reviewed Plaintiff P&M Corporate Finance, LLC's ("PMCF") Verified

Complaint, Motion for Temporary Restraining Order and Preliminary Injunction, and Brief in

Support thereof, and the Court being otherwise duly advised in the premises;

**IT IS HEREBY ORDERED** that on _____, at _____,

Defendant Michael Paparella ("Paparella") shall appear before this Court to show cause why a Preliminary Injunction ordering the relief requested in the Verified Complaint should not be issued.

**IT IS FURTHER ORDERED** that Defendant Paparella shall preserve all evidence, whether in hard copy or electronic form, which in any way relates to the claims made in this case.

**IT IS FURTHER ORDERED** that in connection with same, Defendant Paparella must file and serve responsive papers and briefs by _____ a.m. / p.m. on _____.

**IT IS FURTHER ORDERED** that Plaintiff PMCF may file and serve any reply papers and briefs by _____ a.m. / p.m. on _____.

**IT IS SO ORDERED.**

JUDGE **NANCI J. GRANT**
**CHIEF JUDGE**

Oakland County Circuit Court Judge

A TRUE COPY
RUTH JOHNSON
Oakland County Clerk - Register of Dee

By: _____  Deputy

{2001249.1}

2

# EXHIBIT E

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

P&M CORPORATE FINANCE, LLC,
    Plaintiff,

                        Case # 10-107020-CK
v.                       Hon: D. Langford Morris

MICHAEL PAPARELLA,
    Defendant

**NOTICE OF FILING OF NOTICE OF REMOVAL**
**PURSUANT TO 28 USC 1446(b)**

TO:    Court Clerk                   Counsel for Plaintiff

        1200 North Telegraph Road     James J. Giszczak, Esq.
        Pontiac, MI 48341-0404        Dominic A. Paluzzi, Esq.
                                   McDonald Hopkins PLC
                                   39533 Woodward Ave., Suite 318
                                   Bloomfield Hills, MI 48304

PLEASE TAKE NOTICE that on February 2, 2010, Defendant Michael Paparella filed a notice of removal of this action from the Circuit Court for the County of Oakland, Michigan, to the United States District Court for the Eastern District of Michigan. (See Defendant's Notice of Removal attached as Exhibit A.)

PLEASE TAKE FURTHER NOTICE that pursuant to 28 USC 1446(d), this Court shall proceed no further unless and until this action is remanded.

Dated: _____      Respectfully submitted,
                                   **SULLIVAN AND LEAVITT, P.C.**
                                   By /s/_____
                                   PAUL A. ROBINSON (P39327)
                                   Attorney for Defendant
                                   P.O. Box 5490
                                   Northville, MI  48167
                                   Telephone (248) 349-3984
                                   Facsimile (248) 349-2810
                                   pr@sullivanleavitt.com